

**FORT WORTH** INTER-OFFICE CORRESPONDENCE
*Internal Affairs Section*

DATE:       April 5, 2017

TO:         Joel F. Fitzgerald, Sr., Ph.D.
            Chief of Police

FROM:       Rick Mendoza, Acting Lieutenant
            Internal Affairs Section

SUBJECT:    Internal Affairs Case IA#2017-031

The above numbered investigation is complete and ready for your review and recommendation. The
160 day administrative deadline expires on July 9, 2017. The 180 day statute expires on July 29,
2017. . . ..

Rick Mendoza, Acting Lieutenant                    4/13/17
Internal Affairs Section                           Date

jaw



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB 1 4 2019

CLERK, U.S. DISTRICT COURT
By
        Deputy

**INTERNAL AFFAIRS CASE IA2017-031**

**CASE INFORMATION**

The investigation regarding Internal Affairs Case IA2017-031 has been completed. The
investigation was conducted by Internal Affairs Section Detective J.A. White #3207. The 180 day
statute expires July 29, 2017.

I.   **COMPLAINANT**

     Administration

II.  **OFFICERS INVOLVED**

     Assistant Chief Abdul Pridgen
     Fort Worth Police Department
     Finance/Personnel Bureau

     Deputy Chief Vance Keyes
     Fort Worth Police Department
     Finance/Personnel Bureau
     Operational Command

III. **ALLEGATIONS CITED BY INTERNAL AFFAIRS**

**Assistant Chief Abdul Pridgen:**

General Order 703.00- PROFESSIONAL CONDUCT

(B) Neglect of duty on the part of any employee is cause for disciplinary action. The offender shall
    be disciplined according to the severity of the violation, the commensurate responsibility or
    accountability of their rank or position, the results brought about by the action or inaction, and
    the effect it has upon the discipline, good order, and best interest of the department. Neglect of
    duty includes, but is not limited to, the following:

    (1) Failure of a supervisor to immediately take action when a violation of rules or regulations
        comes to their attention, regardless of the supervisor's or violator's assignment or rank
        within the department.
    (2) Failure to observe and give effect to the federal, state, and local statutes and the policies and
        procedures of the department.



(C) No officer shall engage in any personal conduct which could result in justified unfavorable criticism of that officer or the department.

(I) Officers shall, at all times, respond to the lawful orders of supervisors and other proper authorities as well as requests for police assistance from citizens. The administrative delegation of the enforcement of certain laws and ordinances to particular units of the department does not relieve officers of other units from the responsibility of taking prompt, effective police action within the scope of those laws and ordinances when the occasion so requires. Officers assigned to special duty are not relieved from taking enforcement action outside the scope of their specialized assignment when necessary. All members shall perform their duties as required or directed by law, departmental rule, policy, or by order of a supervisor.

General Order 704.00- CIVIL, CRIMINAL, JUDICIAL, AND INVESTIGATIVE ACTIONS

(G) Officers and civilian employees shall answer all questions candidly, provide full disclosure, and give material and relevant statements when requested by any appropriate authority in a departmental administrative investigation

(R) No officer or civilian employee shall reveal confidential information or documents to anyone unless authorized to do so and then only to a person or persons authorized to receive such confidential information.

General Order 705.02- ETHICAL STANDARDS

(L) Employees have an obligation and responsibility to report all facts or credible information regarding any criminal activity by another employee or any serious breach of written directives.

Texas Penal Code 39.06-MISUSE OF OFFICIAL INFORMATION

(b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:

    (1) he has access to by means of his office or employment; and
    (2) has not been made public.

Deputy Chief Vance Keyes:

General Order 703.00- PROFESSIONAL CONDUCT

(B) Neglect of duty on the part of any employee is cause for disciplinary action. The offender shall be disciplined according to the severity of the violation, the commensurate responsibility or accountability of their rank or position, the results brought about by the action or inaction, and

---

the effect it has upon the discipline, good order, and best interest of the department. Neglect of duty includes, but is not limited to, the following:

    (1) Failure of a supervisor to immediately take action when a violation of rules or regulations comes to their attention, regardless of the supervisor's or violator's assignment or rank within the department.
    (2) Failure to observe and give effect to the federal, state, and local statutes and the policies and procedures of the department.

(C) No officer shall engage in any personal conduct which could result in justified unfavorable criticism of that officer or the department.

General Order 704.00- CIVIL, CRIMINAL, JUDICIAL, AND INVESTIGATIVE ACTIONS

(G) Officers and civilian employees shall answer all questions candidly, provide full disclosure, and give material and relevant statements when requested by any appropriate authority in a departmental administrative investigation

(R) No officer or civilian employee shall reveal confidential information or documents to anyone unless authorized to do so and then only to a person or persons authorized to receive such confidential information.

General Order 705.02- ETHICAL STANDARDS

(L) Employees have an obligation and responsibility to report all facts or credible information regarding any criminal activity by another employee or any serious breach of written directives.

Texas Penal Code 39.06-MISUSE OF OFFICIAL INFORMATION

(b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:

    (1) he has access to by means of his office or employment; and
    (2) has not been made public.

IV. ADDITIONAL OFFICERS/WITNESSES

Deputy Chief Arthur Barclay
Investigative and Support Command
817-392-4121

Lieutenant Leonard Elgin
School Resource Unit
817-392-7573

Lieutenant Cedric Gutter
South Command
817-392-3461

Lieutenant Paula Fimbres
Finance and Personnel Bureau
817-392-4211

Lieutenant Marci Conrad
Backgrounds Unit
817-392-4752

Sergeant Buck Wheeler
Finance and Personnel Bureau
817-392-4289

Sergeant Billie Price
Investigative and Support Command
817-392-4124

Sergeant Michael Williams #3033
Operational Command
817-392-4285

Sergeant Edward Bach
SEER Unit
817-392-4672

Sergeant Troy Lawrence
Digital Forensics Lab
817-392-4553

Sergeant Tom Busker
Narcotics Unit
(817) 378-1500

Jim Willingham
Digital Laboratory Lab
817-392-4553

Sergeant Rick Van Houten
Fort Worth Police Officer's Association
817-870-2171

Dominique Alexander
Next Generation Action Network

Deputy Chief Charles Ramirez #2581
Tactical Command
817-392-4511

Officer William Martin #3572
South Command/South Patrol

Terry Daffron
(817) 763-8385

## INVESTIGATIVE SYNOPSIS

On January 26, 2017, confidential department files pertaining to an administrative investigation in 2013 and 2016 were released outside the police department without consent of the department. Internal Affairs initiated an investigation into the release of confidential information. The investigation focused on personnel who had access to the 2013 and 2016 files. In a letter dated January 31, 2017, all department employees were mandated by Chief Fitzgerald to come forward with any information pertaining to the investigation. The release of confidential department files jeopardized the safety of Officer William Martin. ▉▉▉▉▉▉▉▉

## INVESTIGATIVE DETAILS

### Thursday, January 26, 2017

**Investigation Initiated**

At approximately 0800 hours Fort Worth Police Department Professional Standards and Accountability Bureau Captain Deven Pitt was notified about several confidential documents being released to an outside source/s without the consent of the City of Fort Worth or the Fort Worth Police Department. The released documents consisted of the following:

- Body camera footage of the Craig family arrests

- Documents from a 2013 administrative investigation involving Officer William Martin. The documents in the 2013 administrative case were considered "O-File" material.

- Documents from a 2016 administrative investigation involving Officer Martin. The documents in the 2013 administrative case were considered "O-File" material.

"O-File" information is in reference to Texas Local Government Code 143.089 (g). The statute states:

*A fire or police department may maintain a personnel file on a fire fighter or police officer employed by the department for the department's use, but the department may not release any information contained in the department file to any agency or person requesting information relating to a fire fighter or police officer. The department shall refer to the director or the director's designee a person or agency that requests information that is maintained in the fire fighter's or police officer's personnel file.*

Captain Pitt compiled a list of personnel who had Blue Team software access to the 2013 and 2016 administrative cases. The initial list consisted of:

- Felicia Grantham—Blue Team Administrator
- Sergeant Justin Seabourn—Legal Liaison Supervisor
- Erin Cano—Administrative assistant to Assistant Chief (AC) Ken Dean
- Assistant Chief (AC) Abdul Pridgen
- Deputy Chief (DC) Vance Keyes

On January 26, 2017, during a conversation with the next person in his chain of command, DC Keyes about the release, Pitt said Keyes became "visibly upset," and "overly sensitive" regarding the release. DC Keyes told Captain Pitt the investigation should, "start with Chief Fitzgerald," working downward in the Department as personnel were eliminated from suspicion.

The IAD Blue Team Administrator, Felicia Grantham identified four (4) file names that were released by the files assigned by the Blue Team software package:

Blue Team is the software system used by the Fort Worth Police Department to track and store administrative investigations. Blue Team is the software system used by the Chain-of-Command to review the entirety of internal investigations. IA Pro is the software system used by Internal Affairs to track and store administrative investigations. When Internal Affairs sends a case to the Chain-of-Command it is disseminated using IA Pro, but received and updated by members of the chain of command using Blue Team.

The Root

At 0901 hours a story titled, "Jacqueline Craig Case: Leaked Bodycam Video Shows Cop's Violent Arrest of Mom Seeking Help" (EXHIBIT 1), appeared on a website "theroot.com." The article contained the following department files.



• Officer Martin's typed and signed statement to Internal Affairs on December 27, 2016. This statement was prepared by Officer Martin, and contained personal identifying information, i.e., his home address and personal telephone number.

The aforementioned documents were released to an unknown outside source/s without approval from the City of Fort Worth or the Fort Worth Police Department. The article stated, "The police-bodycam video of the violent Dec. 21, 2016, arrest of a Fort Worth, Texas, woman, and documents related to the arrest as well as the officer's history of using excessive force have been obtained by the attorney for the woman's family and shared exclusively with the The Root."

Facebook Video with Lee Merritt and Jasmine Crockett

At approximately 0430 hours, Lee Merritt and Jasmine Crockett, alleged attorneys representing the family associated with an arrest made by Officer Martin on December 21, 2016, posted a Facebook video (EXHIBIT 2) on the internet stating the video was released by Shaun King. In the Facebook video, Merritt and Crockett provide detailed information not previously known to the public, specifically, details included in Officer Martin's written statement (2016) to Internal Affairs,

Page 8 of 93



descriptions of the incident based on Officer Martin's body camera footage, and details of the earlier administrative case involving Officer Martin (2013).

Youtube Video

Merritt and Crockett posted a video to Youtube. In that video, there is a banner entitled, "Download Leak @bit.ly/FWPDLeaked." The link provides the following documents:

• "Improper Taser Use Report"
• "Martin False Affidavit"
• "Martin's statement on misuse of taser"
• "Misuse of Force Investigation"
• "Video"

Each of the documents are the secure and confidential property of the Fort Worth Police Department, internal documents that were not authorized for release. In the Youtube video, a copy of Officer Martin's statement to Internal Affairs on December 27, 2016, was displayed in the video. The statement contains Officer Martin's home address and personal phone number.

Star-Telegram article

On January 26, 2017, the Fort Worth Star Telegram published an article (EXHIBIT 3) titled, "Fort Worth officials call for police investigation into leaked bodycam video."

Administrative Searches

On January 26, 2017, Captain Pitt contacted Sergeant Troy Lawrence in the FWPD Digital Forensics Unit and requested their assistance in this investigation. Sergeant Lawrence summoned Jim Willingham, a computer forensic examiner (DFU), to 505 W. Felix St. and they began the process of imaging the computers of employees who were initially identified as persons possessing access to the files.

Involved Officer-Assistant Chief Abdul Pridgen

Administrative Search

Captain Pitt conducted an administrative search of AC Pridgen's office, located at 505 W. Felix. The scope of the search was limited to locating and seizing his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The following items were collected:

i. One (1) city computer (PC 32453)

Page 9 of 93

**Witness-Legal Liaison Sergeant Justin Seabourn**

Administrative Search

Detective R. Moore #3142 conducted an administrative search of Sergeant Seabourn's office located at 505 W. Felix. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer PC#33076

Friday, January 27, 2017

Based on the emergent details of the investigation, Captain Pitt determined that IAD would need to confiscate and analyze the desktop computers, USB devices, external hard drives, and city cell phones from all personnel who had access to the 2013 administrative case. Pitt made the decision to narrow the scope of the investigation and focus on the 2013 administrative case because Officer Martin's body camera video was of large file size and had been distributed to a number of personnel outside of Internal Affairs. Furthermore, the 2013 administrative case file sizes were very specific, which made the initial search a manageable task and logical starting point.

Administrative Searches

Internal Affairs, assisted by the Digital Forensic personnel, initiated administrative workplace searches based on the more narrow scope of all persons who had access to the 2013 and 2016 administrative cases involving Officer Martin.

**Witness-Sergeant Michael Williams #3033**

Administrative Search

Detective J.R. Lamond #2919 and Detective J.C. Williams #3498 conducted an administrative search of the office of Sergeant M. Williams #3033, located at 505 W. Felix Street. The scope of the search was to locate and seize his city desktop computer, city owned cell phone, city owned laptop, storage devices, and any paper copies of particular documents associated with this case. The items seized:

1. One (1) city computer # PC33657
2. Once (1) city owned Apple cell phone (Sergeant Williams provided the lock code)
3. Four (4) USB devices

**Involved Officer-Deputy Chief Vance Keyes**

Administrative Search

Lieutenant N. Noakes conducted an administrative search of DC Keyes' office, located at 505 W. Felix. The scope of the search was limited to locating and seizing his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The following items were collected:

1. One (1) city computer

**Witness-Administrative Assistant Erin Cano**

Administrative Search

Captain Pitt conducted an administrative search of Erin Cano' office, located at 505 W. Felix. The scope of the search was to locate and seize her city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer
2. One (1) thumb drive
3. One (1) external hard drive

**Witness-Internal Affairs Administrative Assistant Felicia Grantham**

Administrative Search

Detective R. Moore #3142 conducted an administrative search of Felicia Grantham's office located at 505 W. Felix. The scope of the search was to locate and seize her city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer PC#33087
2. Two (2) thumb drives

**Witness-Sergeant Edward Bach #2547**

**Administrative Search**

Detective J.R. Lamond #2919 conducted an administrative search of the office of Sergeant E. Bach #2547 located in a secure facility. The scope of the search was to locate and seize his city computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer # PC32494
2. Once (1) city laptop # 36033-lap
3. One (1) city owned Apple cell phone.
4. Six (6) USB devices
5. One (1) SD card

**Witness-Lieutenant Cedric Gutter #3019**

**Administrative Search**

Detective J.C. Williams #3497 and Detective R. Moore #3142 conducted an administrative search of the office of Lieutenant Gutter, located at 3128 W. Bolt Street. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. Once (1) city computer #PC33643
2. One (1) Galaxy S3 cell phone

During this search, Lieutenant Gutter asked if he could use his computer for an additional 30 minutes, so he could complete a school exam. Detective Moore and Detective Williams informed Lieutenant Gutter that he would not be allowed to use his computer until the forensic analysis was completed. Detective Moore asked Lieutenant Gutter if he had any documents relating to a 2013 Use of Force case involving Officer Martin. Lieutenant Gutter replied, "I don't keep that stuff here."

**Witness-Deputy Chief Art Barclay #2252**

**Administrative Search**

Detective R.E. Bruno #2701 conducted an administrative search of the office of DC Barclay located at 350 W. Belknap. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copy of particular documents associated with this case. The items seized were:

1. One (1) city computer # PC36745
2. One (1) Apple iPhone

**Witness-Lieutenant Leonard Elgin #3129**

**Administrative Search**

Sergeant R. Mendoza #3120 conducted an administrative search of the office of Lieutenant Elgin located at 6773 Camp Bowie Boulevard. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer serial number JTFZY1Z
2. Three (3) USB devices

**Witness-Sergeant Buck Wheeler #3089**

**Administrative Search**

Detective R. Moore #3142 conducted an administrative search of the office of Sergeant Wheeler, located at 505 W. Felix. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. The items seized were:

1. One (1) city computer PC#33549
2. One (1) Apple iPhone

**Witness-Sergeant Billie Price #2782**

**Administrative Search**

Captain Pitt conducted an administrative search of the office of Sergeant Price, located at 350 W. Belknap. The scope of the search was to locate and seize her city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. Sergeant Price was not present, so Captain Pitt left a note for her directing her to bring her city issued cell phone to Internal Affairs the following week. The items seized were:

1. One (1) city computer # PC33874

**Involved Officer-Deputy Chief Vance Keyes #3195**

**Administrative Search**

On January 27, 2017, Lieutenant Noakes conducted a second administrative search of DC Keyes' office, located at 505 W. Felix. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. Prior to collecting the items, Lieutenant Noakes allowed DC Keyes to transfer the contents of the five thumb drives to one thumb drive provided by

Detective Lamond. The search was conducted at the request of DC Keyes. The following items were collected:

1. One (1) Phone
2. Five (5) USB devices
3. One (1) Surface Pro tablet

Involved Officer-Assistant Chief Abdul Pridgen #2665

Administrative Search

On January 27, 2017, Sergeant Mendoza conducted a second administrative search of the office of Assistant Chief Pridgen located at 505 W. Felix. The scope of the search was to locate and seize his city desktop computer, city owned laptop computer, city owned cell phone, storage devices, and any paper copies of particular documents associated with this case. Pursuant to this investigation, Captain Pitt requested AC Pridgen's city issued cell phone, but AC Pridgen told Captain Pitt he was going out of town for the weekend, so he was not able to surrender the cell phone. AC Pridgen agreed to submit the phone to Captain Pitt when he returned to work the following week. The only items seized on that date were:

1. One (1) SanDisk 4gb USB device
2. One (1) red and silver 2gb USB device, with "SGR" on the thumb drive
3. One (1) My Passport external harddrive.  Serial number WX81AB363341
4. One (1) Untitled "Verbatim" disc
5. One (1) Surface Pro tablet

Monday, January 30, 2017

Captain Pitt request for City of Fort Worth IT Department Assistance

Captain Pitt initiated an IT request to have the shared folders on the City of Fort Worth computer network scanned for the aforementioned file names, specifically in search of the 2013 files. Captain Pitt requested a search of all emails, home drives, printer usage, and scan histories relating to the released files.

Tuesday, January 31, 2017

Chief Fitzgerald email

Chief Fitzgerald sent an email (EXHIBIT h) to all department employees directing any employee with knowledge of the video release to formally report their knowledge of the release. Chief

Page 14 of 93

Fitzgerald reinforced in the letter that "failure to do so is a serious policy violation (insubordination)."

Thursday, February 2, 2017

Involved Officer-Assistant Chief Abdul Pridgen #2665

Administrative Search

Pursuant to an email reminding Pridgen of the chief's order from Captain Pitt on February 2, 2017, AC Pridgen responded to Captain Pitt via email (EXHIBIT 5) about three (3) USB devices that he failed to submit during the first administrative search. Captain Pitt collected three (3) USB devices from AC Pridgen.  Additionally, Captain Pitt finally collected AC Pridgen's city issued Apple iPhone.

Monday, February 6, 2017

Witness-Lieutenant Cedric Gutter #3019

Administrative Search

Pursuant to an email from Captain Pitt on February 2, 2017, Lieutenant Gutter submitted two (2) additional USB devices to Captain Pitt. However, Lieutenant Gutter responded to Captain Pitt's email (EXHIBIT 6) and criticized the authority of his request, citing that Captain Pitt's request exceeded the scope of an administrative search. Captain Pitt replied, reinforcing that it was a direct order to submit any and/all USB devices that had been used in a city owned computer. Lieutenant Gutter relented and surrendered the two (2) additional USB devices.

Wednesday, February 8, 2017

Witness-Jim Willingham Computer Forensics Examiner

Report

Mr. Willingham, a computer forensic examiner for the Fort Worth Police Department, conducted administrative searches on each of the computers seized during the administrative search.  The search revealed that all computers seized, only AC Pridgen's saved ALL of the released documents to an external storage device.  Mr. Willingham completed a report describing the analysis (EXHIBIT 7).

Involved Officer-Assistant Chief Abdul Pridgen #2665

Emails

Internal Affairs obtained copies of AC Pridgen's emails.  Detective White examined AC Pridgen's emails to search for any evidence associated with the release of the documents.  Below is a summary of Detective White's findings:

Page 15 of 93

Witness-Lieutenant Paula Fimbres #3281

Interview

Detective White conducted a recorded interview (EXHIBIT 13) with Lieutenant Fimbres. Prior to the interview Lieutenant Fimbres read and signed a copy of the Administrative Investigation Warning Statement form (EXHIBIT 14).The interview is summarized below.

Lieutenant Fimbres supervises the Public Relations Office. On January 25, 2017, Lieutenant Fimbres was contacted by Assistant City Manager (ACM) Valerie Washington via email (EXHIBIT 15) to work with the City Hall Press Secretary and the Tarrant County District Attorney's Office on a joint press release about the case involving Officer Martin. In the email, Ms. Washington told Lieutenant Fimbres the case was not going to be presented to the Grand Jury, the charges against the Craig family were going to be dropped, and Itamar Vardi would be receiving a Class C citation for Assault. This was the first time Lieutenant Fimbres learned this information. After receiving the email, Lieutenant Fimbres spoke directly with Chief Fitzgerald.



Chief Fitzgerald informed Lieutenant Fimbres that he assigned the task of completing the department's portion of the press release to AC Pridgen (after the City Council Executive Session Meeting on January 24, 2017 – When, in the presence of AC Pridgen, he informed City Council that he was dropping the charges on members of the Craig family) Later in the day, AC Pridgen told Lieutenant Fimbres, per ACM Washington, they needed to release the statement to "black media outlets," in addition to the normal release procedures. Lieutenant Fimbres found this odd because it was not the normal protocol.

Since Lieutenant Fimbres was unaware of specific "black media outlets," she met with Sergeant M. Williams #3033 (Fort Worth Black Law Enforcement Officer Association) and Officer T. Valle #3379 (Public Information Officer). Sergeant Williams suggested that Lieutenant Fimbres could "start with The Root." Sergeant Williams described "The Root" to Lt. Fimbres as a black media outlet. Sergeant Williams provided Lieutenant Fimbres other suggestions, but the other suggested outlets were not local. Officer Valle suggested, the "Fort Worth Black News."

On January 25, 2017, Lieutenant Fimbres and Sergeant Marc Povero stayed at the office waiting for a draft press release from AC Pridgen, so they could proof read the document. By the following morning, Lieutenant Fimbres and Sergeant Povero had still not received a draft from AC Pridgen. Based on the communication Lieutenant Fimbres had with Ms. Washington and the City Hall Press Secretary, she was under the impression the statement was going to be released in the evening of January 25, 2107. Lieutenant Fimbres thought it was "not normal" that she did not receive a draft of the statement from AC Pridgen on January 25, 2017.

On January 26, 2017, Lieutenant Fimbres reported for work at approximately 0800 hours. Shortly upon her arrival, she learned that documents relating to the Officer Martin case were released to the media without the knowledge or consent of the police department.

At approximately 1030 hours, Lieutenant Fimbres observed AC Pridgen watching the leaked body camera footage in the entrance of the Office of the Chief, on Tami Washington's computer. AC Pridgen told Lieutenant Fimbres it was the first time he had seen the leaked video. Lieutenant Fimbres then informed AC Pridgen of other documents in addition to the body camera that had been released. Lieutenant Fimbres found this suspicious because by 1030 hours all the executive staff had already learned of the entirety of the document leak.

Thursday, February 9, 2017

Lee Merritt's Facebook page

Detective White conducted further internet research regarding this case and found that Merritt posted a the following link (EXHIBIT 6) on Facebook entitled "injusticethed".

(https://www.facebook.com/chasttmpv/insrisecmls/?source=feed_text&story_id=1010029276945712 0?).

There was another link on the Facebook page entitled http://bit.ly/FWPDLeaked. The link directed Detective White to the below web address:

https://d1.dropboxusercontent.com/s/842126952/ez4x3n0A6xrittFWPD%20Leaked%20Documents %20and%20Footage.zip

Uploaded in the Dropbox account was a zip file (EXHIBIT 17) entitled, "FWPD Leaked Documents and Footage." The files contained in the Dropbox account had been retained by an unknown person. The zip file contained the following internal government documents:

- "Improper Taser Report"
- "Martin's False Affidavit"
- "Martin's statement on misuse of taser"
- "Misuse of Force Investigation"
- "Video"

The document titled "Improper Taser Report" is a pdf copy of an official FWPD Blue Team report on FWPD report number 13-50816. The document titled, "Martin False Affidavit," is a pdf copy of the official jail paperwork from the December 21, 2016, Craig family arrest. The document titled, "Martin's statement on misuse of taser," is a pdf copy of the official 2013 IOC prepared by Officer Martin. The document titled, "Misuse of Force Investigation," is a word document copy of the 2013 official administrative investigation involving Officer Martin. The icon titled, "video," is a copy of Officer Martin's Axon body camera from the arrest on December 21, 2016, of adult and juvenile members of the Craig family. After discovering the zip file, Detective White provided Mr. Willingham (Digital Forensics) a copy of the same for digital forensic examination.

**Witness-Elizabeth Dierdorf**

**Interview**

On February 9, 2017, Detective White conducted a recorded interview (EXHIBIT 18) with Assistant City Attorney Elizabeth Dierdorf. The recorded interview is summarized below:

On Wednesday, February 8, 2017, Mrs. Dierdorf discovered that she mistakenly released documents to Officer Martin's legal counsel. Part of the documents released were files from several 2013 cases involving Officer Martin that were not authorized for release. Mrs. Dierdorf faxed the release of the 2013 case documents was inadvertent. Mrs. Dierdorf stated she released the documents on a USB device to Officer Martin's legal counsel, Terry Daffron, on January 26, 2016 at approximately 1800 hours, at City Hall. Mrs. Dierdorf contacted Officer Martin's attorney, Terry Daffron, Esq., who stated (in summary) that she did not release nor would she release the documents to anyone. Surveillance video at City

Hall corroborates Mrs. Dierdorf's account that she released the information to Officer Martin's legal counsel on January 26, 2017, at approximately 1800 hours.

**Friday, February 10, 2017**

**Witness-Sergeant Troy Lawrence #2698**

**Report**

Members of the Digital Forensics Lab conducted administrative searches on each of the computers seized during the administrative search. Below is a summary of the DFL report (EXHIBIT 19) detailing the findings:

Only three computers submitted to DFL were identified as containing any of the released files. Two of those computers belong to Sergeant Justin Seabourn and Felicia Grantham, and did contain copies of portions of the released documents; however, there was no indication either employee "exported, shared, or copied the files other than to provide access to the command staff and City Legal."

The city computer assigned to AC Pridgen did not have the files on his computer, but there was "digital evidence showing the 2013 and 2016 Blue Team files were downloaded on January 18, 2017, to removable media plugged into his computer, and some of those files were then opened." The DFL examination also noted the following anomalies:

- In all previous Blue Team downloads, AC Pridgen used the default "Downloads" folder to download Blue Team reports.

- On January 18, 2017, between 1800-1900 hours, AC Pridgen's computer was used to download the 2013 and 2016 case files involving Officer Martin to a "thumb drive assigned drive letter "T:\" drive by Windows." After the file downloads, they were opened from the "D:\" drive. The analysis showed this was the only time files were downloaded to a thumb drive on AC Pridgen's computer. The analysis identified the USB device by a unique serial numbers.  The USB device used for this download was not submitted to DFL.

- "Of the evidence submitted for examination, only AC Pridgen downloaded all four of the Officer Martin files to removable media."

- The missing USB device was not used in any other computer analyzed by DFL.

**Monday, February 13, 2017**

**Zip file analysis**

Mr. Willingham examined the files in the zip folder on Mr. Merritt's Facebook page. The results of the examination revealed the documents entitled, "Martin's statement on misuse of taser" and

"Improper Taser User Report" originated from the "U" drive from AC Pridgen's computer. The metadata from documents on Mr. Merritt's Facebook page revealed the documents were downloaded from AC Pridgen's computer and transferred to the "U" drive on January 18, 2017 at 18:17:26 and 18:21:32. Ms. Willingham completed a timeline (EXHIBIT 20) of his findings.

Tuesday, February 14, 2017

Involved Officer-Deputy Chief Vance Keyes

Personnel Complaint

DC Keyes arrived at the Internal Affairs office and met with Detective White. DC Keyes was served with a Personnel Complaint (EXHIBIT 21). DC Keyes signed the Personnel Complaint and was provided a copy.

Friday, February 17, 2017

Involved Officer-Deputy Chief Vance Keyes

First Interview

DC Keyes arrived at the Internal Affairs office for an interview with Detective White. Prior to the interview DC Keyes read and signed a copy of the Administrative Investigation Warning Statement form (EXHIBIT 22). Detective White conducted a recorded interview with DC Keyes (EXHIBIT 23) as summarized below:

On January 18, 2017, AC Pridgen sent Internal Affairs Administrative Assistant, Felicia Grantham an email (EXHIBIT 24) requesting the 2016 Blue Team case pertaining to Officer Martin and cc'd DC Keyes. Later that day, AC Pridgen called DC Keyes and requested he come to his office. Video evidence confirmed that DC Keyes went to AC Pridgen's office, but at the time of the interview he (DC Keyes) did not recall their discussion.

While in AC Pridgen's office, DC Keyes did not recall discussing the prior cases involving Officer Martin. Furthermore, DC Keyes did not recall AC Pridgen looking at or downloading any information pertaining to cases involving Officer Martin. However, DC Keyes noted that even if AC Pridgen reviewed or downloaded any information pertaining to Officer Martin he would not have thought anything was suspicious because AC Pridgen was privileged to view the cases.

On January 26, 2017, the day the confidential information pertaining to Officer Martin was unofficially released, DC Keyes was notified by Chief Fitzgerald that Assistant City Manager (ACM) Valerie Washington, "wanted us off the case." When DC Keyes used the term "us" he was referring to himself and AC Pridgen. DC Keyes believed that decision was based on a prior issue when he was assigned as the Internal Affairs Commander. Specifically, the issue centered on DC Keyes refusing to release "G-File" information to city

Page 20 of 93

officials. DC Keyes stated he met with the "Mayor and the City Manager, David Cooke." In the meeting, they asked DC Keyes if there was "disparate treatment" in the Department. DC Keyes informed them there was information pertaining to disparate treatment, but it was "G-File" information, so he could not release it.

DC Keyes adamantly and repeatedly denied any involvement in releasing confidential information without authorization, stating in summary that if he observed AC Pridgen downloading information pertaining to Officer Martin or had any knowledge of AC Pridgen releasing the information without authorization, he would have reported his knowledge of the event.

Investigators questioned DC Keyes about his knowledge of events on December 21 and 22, 2016. DC Keyes stated when he arrived at the jail he permitted Lee Merritt, who identified himself as the Craig family attorney, to enter the jail. DC Keyes never asked Merritt for any credentials verifying he was an attorney licensed in the State of Texas. DC Keyes was also asked about text messages between him and AC Pridgen in the early morning hours of December 22, 2016. Specifically, DC Keyes did not know why AC Pridgen suggested he could notify Kim Cole. Kim Cole, Esq., is an attorney for the Next Generation Action Network (NGAN). DC Keyes stated he had never heard of nor met Merritt prior to December 21, 2016.

On February 14, 2017, the day DC Keyes was ordered to Internal Affairs to receive a Personnel Complaint, he stated that he contacted AC Pridgen and told him that he was served a Personnel Complaint. He contacted AC Pridgen because AC Pridgen is his supervisor. As per DC Keyes, AC Pridgen advised him to be honest when interviewed.

DC Keyes stated over the course of the month he grew tired of the case involving Officer Martin, so he tired in fact, that he never even reviewed the 2016 case. DC Keyes stated he has spoken with AC Pridgen on numerous occasions about the administrative case involving Officer Martin, and neither of them agreed with the associated discipline. DC Keyes also stated he was concerned about the investigation involving the release of information because of rumors he heard and other facts released. Specifically, DC Keyes stated his Ph.D dissertation was on one of the thumb drives he released to Internal Affairs. Based on a tracking program associated with the dissertation, he knew someone had downloaded his dissertation using a City of Fort Worth Virtual Private Network in Plano, Texas. DC Keyes also heard rumors he was going to be arrested, and that he, in conjunction with Lieutenant Cedric Gutter and Sergeant Billie Price, released the information.

DC Keyes voluntarily allowed Internal Affairs investigators to examine the content in his personal cell phone. Detective White looked specifically at text messages between AC Pridgen and DC Keyes, however, the text message thread record between him and AC Pridgen began on January 27, 2017. DC Keyes explained that he purchased a new phone on an unknown date in January 2017. The text message thread did not have any evidentiary value relating to the administrative investigation. DC Keyes also stated the person

Page 21 of 93

responsible for releasing the information without authorization should be terminated and charged criminally. However, later in the interview, when confronted with information that AC Pridgen was responsible for the release, DC Keyes refused to offer a suggestion on what should happen because he did not want to "speculate or play hypotheticals."

<u>**Tuesday, February 21, 2017**</u>

**Involved Officer-Assistant Chief Abdul Pridgen #2665**

**Personnel Complaint and Detached Duty**

Detective Lamond sent a Personnel Complaint (EXHIBIT 25) and Detached Duty Paperwork (EXHIBIT 26) via certified US Mail and email to AC Pridgen. The City of Fort Worth Legal Department also sent the documents to AC Pridgen via his attorney. The Personnel Complaint was dated February 20, 2017, at 1344 hours.

<u>**Thursday, February 23, 2017**</u>

**Text Messages**

Detective Lamond conducted follow up research into the call and message logs of AC Pridgen's city cell phone. His inquiry focused on a text message exchange between AC Pridgen and DC Keyes regarding attorney, Kim Cole.

Between 1:42 a.m. and 4:00 a.m. on December 22, 2016, AC Pridgen and a citizen, Dominique Alexander (NGAN) spoke on the phone six (6) times. Three of the calls were made by AC Pridgen, and three were received by him. The calls vary in length between 0:35 (35 seconds) and 4:55 (4 minutes, 55 seconds). Dominique Alexander is the founder of the Next Generation Action Network (NGAN) and has been an outspoken critic of police. Notably, he was the organizer of the protest in Dallas where five police officers were killed on July 7, 2016.

On the web page for the Next Generation Action Network, Kim T. Cole is listed as the Director of Legal Affairs. Ms. Cole is the attorney who represented Dajerria Becton, an African American youth, in potential litigation against the City of McKinney in 2015, when a white police officer, Eric Casebolt, arrested Becton at a pool party. The event was circulated via viral video, garnered national media attention, including a story featured in the Dallas Morning News (EXHIBIT 27). Ms. Cole offered to settle the incident out of court for $2.5 million.

At 2:19:19 a.m., while DC Keyes was at jail meeting with attorney (the person we would later learn was not a licensed attorney in Texas) Lee Merritt, AC Pridgen sent DC Keyes a text message asking, "Does the attorney know Kim Cole...?" At 2:20:42 a.m. DC Keyes replied, "Yes. He does." At 2:21:16 a.m. AC Pridgen responded, "Ok. Is it okay to send her?" At 2:21:47 a.m., DC Keyes follows with, "He doesn't want her here." At 2:21:57 a.m., AC Pridgen finished the exchange with, "Ok."

Two of the calls between AC Pridgen and Dominique Alexander are made shortly before the aforementioned text exchange, at 2:09 a.m., and immediately after the exchange, at 2:22:11 a.m. (14 seconds after closing the text exchange with DC Keyes).

December 22, 2016:

| Time | Event | Duration |
|---|---|---|
| 1:42:10 a.m. | Dominique Alexander calls AC Pridgen | Duration 1:27 |
| 1:46:41 a.m. | Dominique Alexander calls AC Pridgen | Duration 2:23 |
| 2:00:26 a.m. | AC Pridgen calls Dominique Alexander | Duration 4:55 |
| 2:09:37 a.m. | Dominique Alexander calls AC Pridgen | Duration 0:35 |
| 2:19:19 a.m. | AC Pridgen texts DC Keyes, "Does the attorney know Kim Cole (not the "In Living Color" version)? | |
| 2:20:42 a.m. | DC Keyes texts AC Pridgen, "Yes. He does." | |
| 2:21:16 a.m. | AC Pridgen texts DC Keyes, "He doesn't want her here." | |
| 2:2:47 a.m. | DC Keyes texts AC Pridgen, "Ok." | |
| 2:21:57 a.m. | AC Pridgen texts DC Keyes, "Ok." | |
| 2:22:11 a.m. | AC Pridgen calls Dominique Alexander. | Duration 0:37 |
| 4:00:58 a.m. | AC Pridgen calls Dominique Alexander | Duration 1:43 |

On 1/17/2017 at 8:45 p.m. there was a call from AC Pridgen to Dominique Alexander for 29:32.

Below are all of the text messages between AC Pridgen and DC Keyes on December 22, 2016.

| Time | Event |
|---|---|
| 12:05 a.m. | AC Pridgen texts DC Keyes, "Are you at the jail?" |
| 12:06 a.m. | DC Keyes replied, "En route." |
| 12:08 a.m. | AC Pridgen texts DC Keyes, ▓▓▓▓ |
| 12:08 a.m. | AC Pridgen texts DC Keyes, "Not at all." |
| 1:46 a.m. | AC Pridgen texts DC Keyes, "Make sure they don't get transported Mansfield. Let me know when we receive approval to release them. Thanks" |
| 2:18 a.m. | DC Keyes texts AC Pridgen, "I'm going to try to get them released tonight." |

2:18 a.m.   AC Pridgen texts AC Pridge, "Ok."

2:19 a.m.   AC Pridgen texts DC Keyes, "Does the attorney know Kim Cole (not the "In Living Color" version)?"

2:20 a.m.   DC Keyes texts AC Pridge, "Yes."

2:21 a.m.   AC Pridgen texts DC Keyes, "Ok. Is it okay to send her?"

2:21 a.m.   DC Keyes texts AC Pridgen, "He doesn't want her here."

2:21 a.m.   AC Pridgen text DC Keyes, "Ok."

2:23 a.m.   AC Pridgen texts DC Keyes, "Please let me know if/when they're released."

2:23 a.m.   DC Keyes texts AC Pridgen, "I will."

4:29 a.m.   AC Pridgen texts DC Keyes, "Did we check to see when Martin ran the mother? Was it truly before he arrived on the scene?"

6:51 a.m.   DC Keyes texts AC Pridgen, "We tried but we have to wait until later to know."

6:51 a.m.   AC Pridgen texts DC Keyes, "That's what I suspected. I called Michael and only a few people can do it."

7:04 a.m.   AC Pridgen texts DC Keyes, "The video we have has been edited, but that doesn't appear to happen until after the struggle ensues. (After he says he's going to take her to jail for pissing him off. We have the phone so I'm sure we'll see the full version. Restricted status is still warranted until the investigation is completed. (Or 5 days before the Chief meets with him). Lol!!"

The review of text messages revealed the following conversations between AC Pridgen and DC Keyes about the community response to the Officer Martin incident:

December 29, 2016 starting at 7:45 p.m:

AC Pridgen sends DC Keyes the following about a community meeting, "Are you serious?! Who's leading it, your boy Popositerous?" DC Keyes replies, "Dean is actually doing okay." DC Keyes sent a response, "It's the audience." AC Pridgen replied, "Yeah, he talks a good game." AC Pridgen sent a second message stating, "It sounds like a huge waste of time. Popositerous is simply trying to make a name for himself. He has no credibility in the community!" Based on the conversation it appears the "popositerous" is a name used to identify AC Dean.

January 2, 2017 starting at 2:26 p.m:

DC Keyes sent AC Pridgen a message stating, "I can't stand the POA." On the same day at 8:39 p.m., AC Pridgen sent DC Keyes a message stating, "One other thing might come up

Page 24 of 93

and that's officers cleared through BWC video. I recall seeing an email where The Remix talked about it anecdotally, but it's not something we track." Based on prior text messages and information provided in the text message it appears "The Remix" is a name for Captain Pitt.

January 5, 2017 starting at 1:41 p.m.:

AC Pridgen to DC Keyes-I called your boy "The Abstract" out for signing off on a ▮▮▮ Investigator note: ( ▮▮▮▮▮▮▮ )

DC Keyes to AC Pridgen-What did she say?

AC Pridgen to DC Keyes-First it was, "I don't remember that." Then it was, "Oh yeah, I'd have to read it again." I asked if the thought a ▮▮▮▮ was sufficient and he didn't think so. Smh...

DC Keyes to AC Pridgen-I got Leonard this morning. Same deal.

AC Pridgen to DC Keyes-That's why we are where we are!!

DC Keyes to AC Pridgen-That's exactly why. I saw McMath's little part too.

AC Pridgen to DC Keyes-She lied and told someone he got suspended. She was too embarrassed to admit she recommended a ▮▮▮

DC Keyes to AC Pridgen-Man I don't have those issues. I would have canned Rick. Investigator Note: ("Rick" is a reference to FWPOA President Rick Van Houten

DC Keyes to AC Pridgen-Post haste

AC Pridgen to DC Keyes-Me neither!! There wouldn't have been any hesitation.

DC Keyes to AC Pridgen-I hope I don't have to, but I will recommend indefinite when it's warranted. Martin's supervisors are probably not going to sustain anything. We're going to look like fools.

AC Pridgen to DC Keyes-LOL!! You know we will!!

DC Keyes to AC Pridgen-Yeah. It's going to make the chief look bad because everybody knows the was wrong. To say otherwise only encourages similar behavior.

AC Pridgen to DC Keyes-Dean might recommend indefinite...it would be slick.

DC Keyes to AC Pridgen-He could say I tried.

DC Keyes to AC Pridgen-😊 (Investigator note: the face is an emoticon used by DC Keyes)

Page 25 of 93

AC Pridgen to DC Keyes-Dean doesn't have the courage to do that... Everyone would know his recommendation. I'll send you the video the Chief...

The text thread concludes at 1:58 p.m. Additional text messages later infer "The Abstract" is Deputy Chief Barclay.

The case being discussed in the text thread is about a 2013 administrative investigation involving Officer Martin.

**February 28, 2017**

Involved Officer–Assistant Chief Abdul Pridgen #2465

**Personnel Complaint and Detached Duty**

AC Pridgen arrived at Internal Affairs. Detective White served AC Pridgen a Personnel Complaint (EXHIBIT 28) and Detached Duty Status paperwork (EXHIBIT 29). AC Pridgen reviewed and signed both documents. AC Pridgen was provided a copy of both documents.

**March 1, 2017**

Involved Officer–Deputy Chief Vance Keyes #3195

**Detached Duty**

DC Keyes arrived at Internal Affairs and was placed on Detached Duty (EXHIBIT 30). DC Keyes reviewed and signed the Detached Duty documents. DC Keyes was provided a copy of the documents.

Involved Officer–Deputy Chief Vance Keyes

**Second Interview**

DC Keyes arrived at the Internal Affairs office for an interview with Detective White. Prior to the interview DC Keyes read and signed a copy of the Administrative Investigation Warning Statement form (EXHIBIT 31). Detective White recorded his interview with DC Keyes. The recorded interview (EXHIBIT 32) is summarized below.

DC Keyes stated he did not have any new information from his last interview. DC Keyes stated he has scoured his house for flash drives, but he has not found any. He has frequently thought if there was any information he has not shared and could not think of any. DC Keyes stated regarding AC Pridgen, "...he has to come in here and tell what happened."

DC Keyes stated that he has not spoken with AC Pridgen since the investigation unfolded. He stated on the day the documents pertaining to Officer Martin were released he had a conversation with AC Pridgen, but he could not recall the details. Based on the last interview, Detective White confronted DC Keyes with information that he and Pridgen

discussed the Officer Martin case "ad nauseum," but after the release their conversations ceased. DC Keyes stated, "I can't explain that." Sergeant Mendoza pointed out in the evening before the documents were released, DC Keyes had several conversations with AC Pridgen. DC Keyes could not recall what he discussed with AC Pridgen. DC Keyes thought he spoke with AC Pridgen about the release, but he was not certain.

DC Keyes stated he had a meeting with Chief Fitzgerald around the time of the release. He could not recall if the meeting was before or after, but in the meeting he expressed to Chief Fitzgerald he may resign from the department. He stated that he made this statement to Chief Fitzgerald pursuant to a job offer and because he was growing tired of hearing he was a "racist" and "associated with Chief Pridgen..."

Detective White asked DC Keyes, "Do you think Abdul released the information?" DC Keyes replied, "I don't want to get into that..." DC Keyes further stated, "...maybe he did, maybe he didn't." He has to own that." DC Keyes stated, "...I expect him to come in here and tell you exactly what he did."

Detective White focused on January 26, 2017, with DC Keyes. When confronted about a lack of conversation with AC Pridgen about the release, DC Keyes shared that, AC Pridgen stated to him, "This should've never happened." When asked to clarify the statement, "This should never happen." DC Keyes stated it was not about the release, but the position the department was in because of Officer Martin's actions.

Sergeant Mendoza asked DC Keyes about the text messages on his personal phone starting on January 27, 2017. DC Keyes replied, "I went through and I deleted text messages that might be embarrassing ain't I got a damn thing to do with this investigation." Sergeant Mendoza then asked DC Keyes if his text messages were saved to the "cloud." DC Keyes replied, "I don't know what the Cloud is." DC Keyes also stated he did not know if he had an iTunes account. DC Keyes also discussed purchasing a new phone in January and the problems he had setting up the new phone. DC Keyes was asked if he would provide his old personal phone for examination. He stated he may have given the phone to [redacted] or donated it to Goodwill. However, he would check when he got home.

DC Keyes stated he talked about the 2013 case involving Officer Martin with Lieutenant Elgin and DC Barclay. He did not see it as a problem because they were Officer Martin's chain-of-command at the time of the incident and had knowledge of the case.

March 1, 2017

Involved Officer–Assistant Chief Abdul Pridgen

Interview

AC Pridgen arrived at the Internal Affairs office for an interview with Detective White. Prior to the interview AC Pridgen read and signed a copy of the Administrative Investigation Warning Statement form (EXHIBIT 33). Detective White conducted a recorded interview with AC Pridgen. The recorded interview (EXHIBIT 34) is summarized below.

On December 21, 2016, AC Pridgen was contacted via text message by DC Ramirez about a viral video on Facebook showing the arrest of Jacqueline Craig by Officer Martin. AC Pridgen immediately recognized the need to investigate the event. On the night of the arrest, AC Pridgen had several phone conversations with Dominque Alexander. In one of the calls, Mr. Alexander asked AC Pridgen to ask DC Keyes if Lee Merritt wanted Kim Cole to come to the jail. Mr. Alexander told AC Pridgen that Kim Cole was law partners with Mr. Merritt. DC Keyes told AC Pridgen that Mr. Merritt did not want Ms. Cole to come to the jail.

AC Pridgen recalled January 18, 2017, because it was the day before his ███ birthday, the day before a "Leadership Fort Worth" meeting, and two days before he was going out of town. AC Pridgen was asked if he recalled downloading Blue Team documents pertaining to Officer Martin on January 18, 2017. AC Pridgen stated he did not specifically recall downloading the documents on January 18, 2017, but did say he intended to download the documents ██████████████████████████████. Within the context of the same interview, he later agreed that he saved the information pertaining to Officer Martin on a thumb drive. After retracting his original misleading statement, AC Pridgen emphatically began to state that his intent was to provide the information to Chief Fitzgerald and any other city official who may need the information. However, AC Pridgen stated that nobody had made any requests to him for the information.

AC Pridgen stated he frequently communicates with ACA Brown about various issues pertaining to the police department. Detective White asked AC Pridgen why ACA Brown would email AC Dean's discipline recommendation about Officer Martin to him. AC Pridgen stated they communicate about various issues.

On January 24, 2017, at an "executive session" meeting, AC Pridgen learned the charges against the Craig family were being dismissed. Chief Fitzgerald instructed AC Pridgen to speak with Tarrant County District Attorney (CDA) Sharen Wilson about the case and prepare a joint press release with the DA's office and City Hall. The task was supposed to be completed "as soon as possible" because Chief Fitzgerald wanted a citation issued to

Itamar Vardi before he advised ███████ the charges were dropped (out of courtesy) and prior to the release of the statement.

On January 25, 2017, AC Pridgen met CDA Wilson about the case involving Officer Martin. After the meeting, AC Pridgen prepared a draft of the press release. AC Pridgen stated he stayed at the office to approximately 1900 hours working on the press release (EXHIBIT 35). Ordinarily, after completing a press release he would send the statement to Lieutenant Fimbres and/or Sergeant Povero to proofread and disseminate to media outlets. Although AC Pridgen worked on the statement until 1900 hours, he did not submit the statement because it was never completed.

On January 26, 2017, AC Pridgen left a meeting with Chief Fitzgerald. As they were departing Chief Fitzgerald called him over to his car and informed AC Pridgen that documents relating to Officer Martin had been illegally released. It was then AC Pridgen completed the press release and submitted it to city officials. AC Pridgen recalled his draft of the press release as it contained more information than necessary and that the press release was published after the documents were leaked.

AC Pridgen learned of the 2013 cases from Officer Karl Hodge. According to AC Pridgen, he believed Officer Hodge received the information from his former supervisor, Sergeant Tanya McMath (ret).

In reference to the USB device used to download the documents, AC Pridgen does not specifically recall downloading the documents on January 18, 2017. Because he did not specifically recall downloading the documents, he does not know what USB device he would have used. AC Pridgen stated he did not remove any thumb drives from his office and Internal Affairs collected all thumb drives he used in his work computer. AC Pridgen recalled only one event where he took a thumb drive home for a work related purpose. In this event, AC Pridgen stated he was working on a presentation for the City Manager, David Cooke. AC Pridgen pointed out numerous times he does not complete work at home because there is a policy prohibiting telecommuting. To highlight this fact, AC Pridgen stated, "No thumb drive that I've ever had attached to a city computer have I taken home." AC Pridgen, who is also a student, stated he does not complete school projects at work.

In reference to downloading the documents to a USB device, AC Pridgen stated nobody requested the documents from him, but he downloaded them on a USB device in preparation for any request. Furthermore, AC Pridgen stated he downloaded the information to a USB device because Chief Fitzgerald and city executives do not have access to Blue Team. AC Pridgen stated that he never provided Chief Fitzgerald or any other person with the thumb drive that contained the Officer Martin files. Sergeant Mendoza told AC Pridgen, "When the Chief needs somethin', he has a – a folder that only him and the Lieutenant and – there's three pe– I mean, he asks for anything and we drop it in that folder, and it's there for him. I mean, he had – he has access to everything. He had the 2016 case." AC Pridgen replied, "I don't know that he had access to everything. I don't know that he

did. If you're saying he did, okay. I'm doing what I believe is my due diligence, to make sure that he's fully aware of everything that's going to come his way in relation to this case."

Because the forensic examination of Pridgen's files, storage devices, hardware, etc., revealed he never downloaded any documents from Blue Team directly to a USB device with prior cases be reviewed using the software, investigators questioned him regarding the deviation from his norm. AC Pridgen stated he normally opens Blue Team documents by clicking on the link. When Blue Team documents are opened in this manner, Blue Team software sends the documents to the temporary downloads folder. However, in this unique case, the documents downloaded by AC Pridgen were downloaded directly to a storage device in the "F" drive of his city computer. According to Digital forensics, in order to accomplish a download in this manner, the user must right click on the link and save the file as "save as" into a destination that is determined by the user. When confronted with this information, AC Pridgen conceded to the fact he downloaded the documents in question. AC Pridgen also stated the has never downloaded files to give to the chief because, "We have never had an incident like this. So there's no precedent for this."

In reference to DC Keyes being present when the documents were downloaded, AC Pridgen could not recall why DC Keyes was in his office and did not recall telling DC Keyes he was downloading the documents. He stated he did not recall viewing the video while DC Keyes was in his office. AC Pridgen stated several times he did not give a thumb drive to DC Keyes while he was in the office.

AC Pridgen was asked, "Do you think Deputy Chief Keyes could've taken a thumb drive from your office?"

AC Pridgen replied, "I don't think he would have."

Later in the interview, AC Pridgen was informed by investigators that in order for the documents to be released, it had to have been either him or DC Keyes.

AC Pridgen replied, "Well, I – all I know is I didn't do it and I don't – I can't say Vance Keyes did it, 'cause I don't know. I know I didn't do it."

AC Pridgen was asked, "Do you think Deputy Chief Keyes, um, took that thumb drive without your knowledge and released it to Lee Merritt?"

AC Pridgen replied, "I don't think he would do that." Detective White followed up with, "Is it a possibility?" AC Pridgen replied, "Anything's a possibility. Anybody who was in my office, even with me in there, could potentially have done it. If I wasn't payin' attention. So..."

AC Pridgen agreed that he and DC Keyes were the only people in the office when the documents were downloaded. After acknowledging this fact, Detective White asked AC Pridgen, "So if you didn't do it, then – then it would've had to have been Deputy Chief Keyes." AC Pridgen replied, "I don't know, and I'm not gonna say that. I don't know."

In reference to AC Pridgen's relationship with Lee Merritt, Dominique Alexander, Kim Cole, and Jasmine Crockett, AC Pridgen acknowledged that he had phone contact with Dominique Alexander. AC Pridgen stated he did not personally know Ms. Cole and has only said hello to Mr. Merritt in passing. On December 22, 2016, AC Pridgen stated he asked DC Keyes about Kim Cole coming to the jail at the request of Dominique Alexander. After learning Kim Cole is an attorney for Next Generation Action Network, Detective White asked AC Pridgen, "We- knowing what you know about Kim Cole now, in terms of her being an attorney–an activist. Would that be a good idea, to have her at the jail that night?" AC Pridgen replied, "If she's representing a client, I'm going to allow her to see her client. Because she is an activist, she's also representing someone." AC Pridgen could offer no other examples of when an attorney was allowed to see their client at the City of Fort Worth jail.

AC Pridgen repeatedly stated he did not know how the documents were released and he was not responsible for the release. Specifically, he stated, "It makes no sense for me to commit a crime to release information that's gonna get released anyway. 'Cause in his lawsuit, he was going to get everything, GI the information included." At the time of the interview and this report no lawsuit had been filed against the City of Fort Worth in regards to the incident involving Officer Martin.

When asked who had motive to release the documents, AC Pridgen replied,

"Anybody. Well, people – s- somebody who has a vendetta against the Chief and wants to make him look bad, or undermine him. And that's not me."

Detective White asked AC Pridgen, "Okay. Do you know anybody that has a vendetta against the Chief or wants to undermine him?"

AC Pridgen identified Sergeant Rick Van Houten because, "He's workin' behind the scenes to undermine the Chief."

Sergeant Van Houten was the only person identified by AC Pridgen who would have motive to release the documents. As Detective White asked AC Pridgen whether his Administrative Assistant, Nicole Garcia, could have released the documents using his sign on, AC Pridgen interrupted and replied, "No." Nicole Garcia had access to AC Pridgen's office, even when

locked, and the sign on to his city computer. Sergeant Mendoza asked AC Pridgen if Laeticia Brown would have taken the USB device. AC Pridgen responded, "No."

AC Pridgen was asked why he did not request every case associated with Officer Martin. AC Pridgen replied, "I think I did." Sergeant Mendoza pointed out to AC Pridgen, "But you didn't received every case that – that Martin had ever been associated with via Blue Team." AC Pridgen responded,

"No, it – it was the 2013 and the most recent one. 'Cause those are the only ones that were of issue."

AC Pridgen told investigators his personal computer was a Mac and that his personal computer would not contain any evidence associated with the case, but he would not allow the department to search his personal computer without first consulting with his attorney. In reference to any cloud based storage programs, AC Pridgen stated he uses Dropbox, but the last time he used it was two or three months ago. AC Pridgen thinks he has a "Google Plus" account. He does not have a "Scribd" account.

In summary, AC Pridgen did not recall downloading the documents, but agreed that he did only when confronted with evidence supporting this claim. He amended his reasoning for the download, stating that his intent was to share the documents with Chief Fitzgerald and any other city official who may need to view them. He stated several times, his actions were within the "course and scope" of his job. AC Pridgen never provided anyone with a thumb drive or told anyone he downloaded documents to a thumb drive. When he first learned of the documents being released he did not volunteer the fact that he (alone) downloaded the same exact leaked documents because he did not remember. Other than inferring that someone surreptitiously entering his office, or someone stealing a thumb drive when he was not paying attention, he could not account for how the exact files (that only he downloaded from his city computer) ended up in Lee Merritt's Dropbox account.

AC Pridgen suggested that we interview Shaun King (AP reporter) and Lee Merritt stating, "(they will tell you they got nothing from me, and they don't even know me." He believed Lee Merritt mentioned the idea of receiving info from a respected source within the department to "legitimize" the illegally provided, obtained/posted government information.

---

**Friday, March 3, 2017**

**Witness–Administrative Assistant Nicole Garcia**

**Interview**

Detective White met with Ms. Garcia at the Internal Affairs office and conducted two recorded interviews (EXHIBIT 36 and EXHIBIT 37). Prior to the interview, Ms. Garcia read and signed an Administrative Warning Statement (EXHIBIT 38). The recorded interview is summarized below.

Ms. Garcia is AC Pridgen's Administrative Assistant. She has worked for AC Pridgen for approximately two years. Ms. Garcia has access to AC Pridgen's email calendar, but she does not have access to his email account. AC Pridgen has provided Ms. Garcia with his password for his city computer sometime in 2016, but she did not know whether or not if it was current. Ms. Garcia has never logged into the Blue Team system with AC Pridgen's sign on, nor did Ms. Garcia know Pridgen's Blue Team user identification, or sign on.

Ms. Garcia last spoke with AC Pridgen on February 28, 2017, when he came to Internal Affairs for his Personal Complaint. When she saw AC Pridgen in the main lobby he told her that he was there to accept his Personal Complaint and told them not to worry because he had nothing to hide. AC Pridgen did not elaborate on his allegations.

Ms. Garcia described AC Pridgen as controversial and sometimes a person whose message is not well received, so she is not "shocked" by the investigation. Ms. Garcia stated it was common for AC Pridgen to visit with Chief Fitzgerald, the other assistant chiefs, Sergeant Wheeler, the PRO Team, and Kala (Howard). Ms. Garcia stated she had several conversations with AC Pridgen about the Officer Martin case. The conversations consisted of press conference information and, Lee Merritt's "Go-Fund Me page." Ms. Garcia stated she does not know if AC Pridgen know Mr. Merritt and does not know if Mr. Merritt ever called AC Pridgen. Ms. Garcia could not recall AC Pridgen stating his personal opinion about the Officer Martin case.

In her conversations with AC Pridgen, Ms. Garcia stated AC Pridgen has always tried to improve the department and that AC Pridgen always tries to contribute in making the department better. AC Pridgen holds his employees accountable and if they do not complete assigned tasks they "get in trouble." When AC Pridgen learned he did not get the FWPD Chief job, Ms. Garcia stated he backed the chief. Ms. Garcia stated she does not know who is a close confidant of AC Pridgen. She described him as being "solo" and stated that he does not "hang out" with anybody specific.

Ms. Garcia admitted that she keeps a key to AC Pridgen's office in a cup on top of her "credenza." She confided that AC Pridgen also usually leaves his office looked, however, she said, "a lot" of people don't know where she keeps the key. "Less than a handful of times" Ms. Garcia allowed people to enter AC Pridgen's office when he was not there. Sergeant Wheeler also has a key to AC Pridgen's office. Ms. Garcia leaves that key in a cup near her

desk, in case someone gets locked out. From the middle of January to the date of the interview, Ms. Garcia believes she and Kala Howard were the only people who entered AC Pridgen's office when he was not there. Kala will enter the office to place confidential documents inside.

Ms. Garcia showed Detective White a text message thread between her and AC Pridgen's personal cell phones. In the text message thread, Ms. Garcia and AC Pridgen discussed who would serve as acting Assistant Chief while he is on vacation. In the conversation, Ms. Garcia referred to DC Kamper as, "top heavy," and DC Ramirez is referred to as, "rock and roll." AC Pridgen replied that he did not trust DC Kamper because of questionable decisions. AC Pridgen elaborated by providing two specific examples. First, he alleged that DC Kamper asked SIU if they were investigating a relative. Second, she allegedly allowed a "character reference" to be included in a previous discipline case.

In the text message thread, it was apparent AC Pridgen knew who Ms. Garcia was calling "top heavy" and that he never discouraged or corrected her when she called DC Kamper "top heavy," failing to provide her necessary corrective supervision. Ms. Garcia stated it is a name they have used in the past to describe DC Kamper. Ms. Garcia does not know who came up with the nickname "top heavy" and that AC Pridgen has never told Ms. Garcia to not refer to DC Kamper as "top heavy." Ms. Garcia stated the name "top heavy" was in reference to DC Kamper's "chest area." Ms. Garcia provided Detective White with copies of the text messages (EXHIBIT 39).

Witness-Detective Jesus Banda #3125

Interview

Detective Lamond met with Detective Banda at the Internal Affairs office and conducted a recorded interview (EXHIBIT 40). Prior to the interview, Detective Banda read and signed an Administrative Warning Statement (EXHIBIT 41). The recorded interview is summarized below.

Detective Banda has been with the Fort Worth Police Department for over 17 years, and has been assigned to the South Division Criminal Investigations Unit for approximately one year. He was assigned the case related to the arrest of the Craig family by Officer Martin. Detective Banda filed the adult cases with the Tarrant County District Attorney and filed the juvenile case with Tarrant County Juvenile Services. The District Attorney declined to accept any of the cases, but Detective Banda wasn't contacted or notified of this. He learned the cases were rejected by watching the news.

When Detective Banda was assigned the case for investigation, he received a CD of Officer Martin's body-worn camera from Internal Affairs Sergeant Mendoza and Internal Affairs Detective Moore. This original disc is still in the unit file with the other paperwork on the case. In preparing the cases for submission into the court systems, Detective Banda made copies of the case materials. The two copies for the juvenile case were placed in an office

Page 34 of 93

tray for the Youth Section, and Detective Banda drove downtown to the District Attorney's office to personally deliver the case materials for the adult cases. When approving the juvenile case packets, the original disc was temporarily in the custody of Detective Banda's supervisor, Sergeant Garrett.

During the time that Detective Banda was working on the cases, and the materials were still on his desk, Lieutenant Gutter asked Detective Banda for the original disc on two separate occasions and was provided the information. The first time, Lieutenant Gutter had the disc in his possession for approximately two days. About a week after returning the disc to Detective Banda, Lieutenant Gutter asked for the disc again. The second time Lieutenant Gutter obtained the disc from Detective Banda, he kept it for more than a week. On Friday, January 27, 2017, Detective Banda returned to the office from a field interview, and found the original disc was returned, and placed back on his desk. Detective Banda said Lieutenant Gutter didn't discuss the case with him, nor had he ever requested any materials on any cases assigned to him in the past.

Involved Officer-Assistant Chief Abdul Pridgen #2665

Open Records Request

On March 3, 2017, Scott Gordon, a reporter for NBC, filed an open records request (EXHIBIT 42) for "copies of all text messages on the department cell phone of Assistant Chief Abdul Pridgen from Dec. 21, 2016, until the date this request is processed."

Monday, March 6, 2017

Witness-Sergeant Buck Wheeler #3089

Interview

Detective White met with Sergeant Wheeler at the Internal Affairs office and conducted a recorded interview (EXHIBIT 43). Prior to the interview, Sergeant Wheeler read and signed an Administrative Warning Statement (EXHIBIT 44). The recorded interview is summarized below.

Sergeant Wheeler is an Administrative Sergeant assigned to Finance and Personnel Bureau and reports directly to AC Pridgen. Sergeant Wheeler has a key to AC Pridgen's office which is "normally" locked. Sergeant Wheeler stated that he has never removed anything from his (Pridgen's) office without his knowledge and/or consent. AC Pridgen has never instructed Sergeant Wheeler to take any documents or electronic storage devices to anyone. Sergeant Wheeler does not have access to AC Pridgen's computer sign on information.

Sergeant Wheeler and AC Pridgen discussed the 2016 cases involving Officer Martin. He stated they talked about it in relation to the Procedural Justice Unit, which Sergeant Wheeler supervises. Several days after the incident, Sergeant Wheeler and AC Pridgen watched

Page 35 of 93

Officer Martin's Axon body camera footage. AC Pridgen expressed concern with how Officer Martin acted and AC Pridgen seemed "frustrated" by and "disappointed in Officer Martin's actions."

Sergeant Wheeler never discussed the release of the documents with AC Pridgen. Sergeant Wheeler and AC Pridgen had a professional work relationship, so it did not seem odd the release of the documents was not discussed. Sergeant Wheeler saw DC Keyes frequently visit AC Pridgen's office.

**Tuesday, March 7, 2017**

**Witness–Sergeant Roy Hudson #2975**

**Interview**

Detective White met with Sergeant Hudson at the Internal Affairs office and conducted a recorded interview (EXHIBIT 45). Sergeant Hudson was interviewed because he was the past President for the President of Fort Worth Black Law Enforcement Officer Association (FWBLEOA). Prior to the interview, Sergeant Hudson read and signed an Administrative Warning Statement (EXHIBIT 46). The recorded interview is summarized below:

Sergeant Hudson was the President of Fort Worth Black Law Enforcement Officer Association (FWBLEOA) for approximately two and half years. When he was the President of FWBLEOA, he stated the FWBLEOA did not have a relationship with Lee Merritt, Kim Cole, or Dominique Alexander.

**Witness–Officer Karl Hodge #2473**

**Interview**

Detective White met with Officer Hodge at the Internal Affairs office and conducted a recorded interview (EXHIBIT 47). Prior to the interview, Officer Hodge read and signed an Administrative Warning Statement (EXHIBIT 48). The recorded interview is summarized below:

Officer Hodge is an officer assigned to the Fort Worth Police Department Mounted Patrol Unit. Officer Hodge speaks with AC Pridgen once every two to three months. On an unknown date, Officer Hodge stated he contacted AC Pridgen and informed him of a ▓▓▓ case in 2013 involving Officer Martin. Officer Hodge said he had informed AC Pridgen of the prior incident during the course of "casual conversation. "Hodge said that AC Pridgen seemed "surprised" to learn of the 2013 incident, and stated there was "nothing" in Officer Martin's record relating ▓▓▓▓▓▓▓. Officer Hodge told AC Pridgen that Officer Martin was ▓▓▓▓▓▓ based on a conversation he had with Sergeant McMath.

Officer Hodge last spoke with AC Pridgen approximately one week prior to the interview and he talked to DC Keyes approximately one month prior to the interview. Officer Hodge

stated the department is experiencing more "factual" than any other time in his career. He stated there are "cliques" and frauds "taking care" of each other.

Officer Hodge stated that he "could care less" the documents were released. Officer Hodge first learned of the 2013 ▓▓▓▓▓▓ case because he was assigned to East Patrol at the time and Sergeant McMath (ret) told him about the incident. Sergeant McMath told Officer Hodge soon after the 2016 incident involving Officer Martin was reported. Officer Hodge stated he never read any documents pertaining to the 2013 ▓▓▓▓▓▓ investigation. His only knowledge was based on verbal conversations.

**Witness–Lieutenant Leonard Elgin #3129**

**Interview**

Detective White met with Lieutenant Elgin at the Internal Affairs office and conducted a recorded interview (EXHIBIT 49). Prior to the interview, Lieutenant Elgin read and signed an Administrative Warning Statement (EXHIBIT 50). The recorded interview is summarized below:

Lieutenant Elgin shared that he has spoken with AC Pridgen and DC Keyes, but it was limited to the initial investigation involving the arrest of the Craig family. Lieutenant Elgin stated when the Facebook video was released he talked to DC Keyes. When the initial investigation was underway, DC Keyes asked him about the 2013 ▓▓▓▓▓▓ case involving Officer Martin. DC Keyes asked Lieutenant Elgin about this logic as it related to his disciplinary decision. DC Keyes questioned Lieutenant Elgin's decision in discipline and did not seem to agree with Lieutenant Elgin's decision. Lieutenant Elgin was an Administrative Sergeant in East Patrol during the 2013 ▓▓▓▓▓▓ case. After the 2016 incident, Lieutenant Elgin indicated that he regretted his own disciplinary decision in the 2013 case. Lieutenant Elgin and AC Pridgen have a professional relationship and have not discussed the cases involving Officer Martin.

**Wednesday, March 8, 2017**



Sergeant Williams believes Mr. Merritt thanked the FWBLEOA pursuant to a statement (EXHIBIT 55) made by the FWBLEOA which spoke in opposition to the discipline given to Officer Martin. Sergeant Williams stated the goal of the statement was to voice their disagreement with Officer Martin's punishment. Sergeant Williams believes Mr. Merritt was giving the FWBLEOA a "thumbs up." Sergeant Williams does not know if Mr. Merritt contacted any FWBLEOA members about the incident involving Officer Martin.

Sergeant Williams is the Administrative Sergeant for DC Keyes. Sergeant Williams stated DC Keyes never shared any documents with him about Officer Martin. Sergeant Williams and DC Keyes talked about the incident involving Officer Martin, but it was "just generality." Sergeant Williams does not recall discussing any specifics about the Officer Martin case with DC Keyes.

Witness-Lieutenant Cedric Gutter #3019

Interview

Detective White met with Lieutenant Gutter at the Internal Affairs office and conducted a recorded interview (EXHIBIT 56). Prior to the interview, Lieutenant Gutter read and signed an Administrative Warning Statement (EXHIBIT 57). The recorded interview is summarized below:

Lieutenant Gutter has been the South Division Criminal Investigation Commander for 1 ½ years. When the 2016 case involving Officer Martin was assigned to SCIU Detective J. Banda, Lieutenant Gutter asked Detective Banda for the CD containing Officer Martin's body camera footage. Lieutenant Gutter was not sure when he asked for the CD, but remembered getting the CD from Detective Banda on two separate occasions. Furthermore, he does not know how long he was in possession of the CD.

Lieutenant Gutter initially stated he watched the video for "clarity" and he did not have a specific reason in viewing the video. Lieutenant Gutter stated he wanted to watch the body camera video to compare it to the Facebook video taken by Jacquelyn Craig's daughter. Lieutenant Gutter could not remember when he returned the CD to Detective Banda, but believed it was either the day Internal Affairs investigators confiscated his computer or the day before. Lieutenant Gutter stated he only viewed the CD in his office and never removed the CD from his office.

Detective White asked Lieutenant Gutter his purpose in viewing the video. Lieutenant Gutter replied he just wanted to compare the two videos and could offer no legitimate purpose. Lieutenant Gutter could not recall any other time where he has reviewed or offered advice to Detective Banda about work tasks. Lieutenant Gutter stated he did not offer any advice to Detective Banda about the criminal case involving Jacquelyn Craig because he was on vacation during Detective Banda's investigation. When he returned to work, Detective Banda had already filed the case.

Page 39 of 93

Witness-Sergeant Michael Williams #3033

Interview

Detective White met with Sergeant Williams at the Internal Affairs office and conducted a recorded interview (EXHIBIT 53). Prior to the interview, Sergeant Williams read and signed an Administrative Warning Statement (EXHIBIT 54). The recorded interview is summarized below:

Sergeant Williams became the President of Fort Worth Black Law Enforcement Officer Association (FWBLEOA) in October 2016. Sergeant Williams stated he did not know why Lee Merritt thanked the "BPA", a reference to FWBLEOA. Sergeant Williams does not know and has never met Mr. Merritt.

Page 38 of 93



Detective White asked Lieutenant Guter if he had spoken with DC Keyes about the "leak" investigation. Lieutenant Guter became agitated and refused to answer. Instead of answering Detective White's question, Lieutenant Guter asked, "What am I a witness to?" After repeatedly asking Lieutenant Guter if he had spoken with DC Keyes about the "leak" investigation, he stated he had talked to him about the rumors and "propaganda." Detective White asked Lieutenant Guter if the rumors and propaganda pertained to the Officer Martin case. Lieutenant Guter replied, "Its what's ever on television." Lieutenant Guter refused to provide any details of his conversation with DC Keyes.

Detective White asked Lieutenant Guter, "When's the last time you talked to Deputy Chief Keyes?" Lieutenant Guter replied, "We talk often." Lieutenant Guter would not provide specific details, but when confronted he stated he asked to DC Keyes the day of the interview. Although the interview was at approximately 1400 hours, Lieutenant Guter would not provide an approximate time when he spoke with DC Keyes other than saying it was sometime between 0800 and 0930 hours. Lieutenant Guter stated he spoke with DC Keyes to "check on his psyche."

Lieutenant Guter was AC Pridgen's Administrative Sergeant for several years starting in 2013. Detective White asked Lieutenant Guter when he last talked to AC Pridgen. Lieutenant Guter replied, "I think I talked to him last night." Lieutenant Guter stated he has not discussed the "leak" case with AC Pridgen because, "These guys do not want me involved in this in any kind of way." Relating to the investigation, Lieutenant Guter stated the only conversation he had with AC Pridgen was when he called to find out if AC Pridgen was "burning time." AC Pridgen told him he was not burning time and he had not done anything wrong.

In terms of the investigation on the "leak", Lieutenant Guter said it seems like a "racial witch hunt." He believed the only reason his computer was confiscated and he was being interviewed was because of this relationship with AC Pridgen and DC Keyes. Based on his relationships, Detective White asked Lieutenant Guter if AC Pridgen or DC Keyes called him before his computer was confiscated by Internal Affairs. Lieutenant Guter replied he could not recall. Detective White asked Lieutenant Guter if anyone told him Internal Affairs was collecting computers. Lieutenant Guter replied, "I'm not sure, really."

Lieutenant Guter was confused why his computer was confiscated, but South Division Commander Captain Tyson Cheek did not have his computer confiscated. Detective White explained to Lieutenant Guter he had access to the 2013 and 2016 cases involving Officer Martin. Detective White asked Lieutenant Guter who he told about his computer being confiscated. Lieutenant Guter replied, "I don't know." Due to Lieutenant Guter's lack of cooperation and effort to frustrate the interview process, Captain Deven Pitt assisted in the interview.

## Witness-Media Specialist Tom Sullivan

### Interview

Detective White met with Mr. Sullivan at the Internal Affairs office and conducted a recorded interview (EXHIBIT 58). Prior to the interview, Mr. Sullivan read and signed an Administrative Warning Statement (EXHIBIT 59). The recorded interview is summarized below:

Mr. Sullivan is a Communication Specialist/Social Media Manager for the police department. Mr. Sullivan works in the PIO Team office and has been employed by the department for four years. On January 26, 2017, Mr. Sullivan was monitoring the FWPD Facebook page due to significant activity on the Facebook and Twitter pages pursuant to the illegal/unauthorized release of documents pertaining to the Officer Martin case. In the morning hours, Mr. Sullivan took a short break in the hallway outside of his office. While he was standing in the hall, Mr. Sullivan observed AC Pridgen walking down the hall. Mr. Sullivan stated to AC Pridgen, "Can you believe this?" The statement was a reference to the documents being released. AC Pridgen stopped and stated he had been at the office until 10:00 or 10:30 the night before working on a press release.

Mr. Sullivan has had an office near AC Pridgen for approximately two years. Mr. Sullivan sees AC Pridgen a few days a week in "passing." In the time Mr. Sullivan has worked near AC Pridgen they have had a work related conversation about an "ER issue" and baseball. In hindsight, Mr. Sullivan found his interaction with AC Pridgen on January 26, 2017, "odd" because it seemed as if AC Pridgen was making Mr. Sullivan an "alibi." Mr. Sullivan told his supervisor, Lieutenant Paula Fimbres, about the interaction.

### Thursday, March 9, 2017

Involved Officer-Assistant Chief Abdul Pridgen #2665

### Email

Detective White emailed (EXHIBIT 60) AC Pridgen at 1145 hours, and instructed him to bring in his city issued cell phone pursuant to an open records request. At 1205 hours, AC Pridgen acknowledged the email. At 1209 hours, AC Pridgen emailed Detective White and asked, "Who from the media made the request?" At 1326 hours, Detective White emailed AC Pridgen and informed him the request was from Scott Gordon and NBC. At 1332 hours, AC Pridgen responded in an email, "Thanks."

**Friday, March 10, 2017**

Involved Officer-Deputy Chief Vance Keyes

Third Interview

Detective White and AC Kraus met with Deputy Chief Keyes at the Internal Affairs office and conducted a recorded interview (EXHIBIT 61). Prior to the interview, Deputy Chief Keyes read and signed an Administrative Warning Statement (EXHIBIT 62). The recorded interview is summarized below:

DC Keyes has been employed by the department for 16 years. In his career DC Keyes has held a variety of positions including Narcotics Unit Commander, Internal Affairs Commander, Patrol Captain, and Deputy Chief over Operational Command. DC Keyes holds two Master's degrees and a Ph.D.

Pursuant to a prior interview, Detective White asked DC Keyes if he brought his old iPhone. DC Keyes stated he did not look for his old iPhone, because he purchased his new iPhone on January 2, 2017, and any text messages pertaining to the investigation would not be on his old phone. DC Keyes showed Detective White a receipt verifying he purchased an iPhone on January 2, 2017.

DC Keyes did not recall any additional information he had not already shared with Internal Affairs. AC Kraus asked DC Keyes when he last spoke with AC Pridgen. Consistent with the previous interviews, DC Keyes stated he spoke with AC Pridgen on February 14, 2017. In this interview, DC Keyes elaborated more about his conversation with AC Pridgen. In the conversation on February 14, 2017, AC Pridgen described the investigation as a "witch hunt." AC Pridgen told DC Keyes if he did not do anything then he should not worry about the investigation.

Next, AC Kraus focused his questions on December 21, 2016. He did not know if AC Pridgen was out of town on the Craig incident. AC Pridgen called DC Keyes at approximately 2200 hours, and informed him of the arrest involving Jacquelyn Craig. Possibly at the request of AC Pridgen, DC Keyes responded to the jail.

When DC Keyes arrived he was greeted by Lee Merritt. Mr. Merritt told DC Keyes he was the family's attorney. After a brief conversation, DC Keyes allowed Mr. Merritt inside the jail with him. Once inside the jail, DC Keyes called Mr. Merritt and told him about Mr. Merritt's presence and they decided to allow him to sit in the interviews of Ms. Craig and Brea Hymond. DC Keyes made the concession because the video looked "horrendous."

AC Pridgen and DC Keyes discussed allowing another attorney wanting to represent the family to respond to the jail. AC Kraus asked DC Keyes if he ever talked to a city attorney. DC Keyes thought he may have contacted Laetitia Brown, but he was not certain. When

Page 42 of 93

asked if his decisions were in the best interest of the City of Fort Worth, DC Keyes responded,

"I think when I contacted my immediate supervisor that's what I was doing Chief. I'm a Deputy Chief, I report to an Assistant Chief and..."

AC Kraus asked DC Keyes how many times that he has released somebody from the jail? DC Keyes responded,

"I have never been a Deputy Chief over Internal Affairs where I've seen an officer mistreat somebody before if it happened again, I would do the same thing again."

Because of his rank, Deputy Chief Keyes believed he had the authority to release Ms. Craig and Ms. Hymond. Furthermore, his logic was "get them out of here tonight and we'll deal with it later and it didn't happen. It did not happen."

DC Keyes was allowed to view the surveillance video of him entering and leaving AC Pridgen's office on January 18, 2017. Even after viewing the video, DC Keyes did not recall the day or the conversation he had with AC Pridgen. DC Keyes expressed he should not be expected to recall a one month old conversation.

AC Kraus confronted DC Keyes about him denying any knowledge of AC Pridgen downloading the released documents. DC Keyes stated, "...I don't monitor my bosses - I - he could've downloaded 15 things I would've thought nothing of it. So many times I go in the man's office, he's doing a document, he's on the computer, I don't look at it, I just don't Chief." DC Keyes also stated AC Pridgen did not share with him he was downloading any documents. While DC Keyes was in AC Pridgen's office, AC Pridgen accessed and downloaded over 35 documents in a 17 minute period.

According to DC Keyes, Chief Fitzgerald designated him as the department liaison with Lee Merritt. At the direction of Chief Fitzgerald, DC Keyes would call Mr. Merritt and inform him of the status changes in the Officer Martin case, "so he doesn't jump the gun and just put us out there recklessly." Although DC Keyes stated he was appointed by Chief Fitzgerald as the Department liaison, he was not appointed to serve in this capacity. DC Keyes spoke with Mr. Merritt 10-20 times during the Officer Martin investigation. DC Keyes would contact Mr. Merritt using his personal cell phone instead of his city cell phone. DC Keyes also stated he had text message exchanges with Mr. Merritt, but he could not find or did not share with Internal Affairs the content of the text messages. DC Keyes stated he used his personal phone because:

Page 43 of 93

*I had his number in here, um, this is the number I used during the daytime for the most part. Uh, I use this phone but I get so many bogus jacked up telemarketers that if I'm not – if I'm on call I always give this number out 'cause this is my night time, that is my phone, for night time if somebody calls on it's gonna be police at night and it's gonna be that I got marine buddy's in Hawaii and they'll just call not carin' what time it is, drunk or whatever and they'll wake me up this whole thing and so I try to keep em separate.*

DC Keyes agreed Lee Merritt was not a "friend or ally of the city."

When SIU Commander, Lieutenant Todd Plowman, asked DC Keyes if he would consent to an interview, DC Keyes asked if he was an "involved officer," or a witness. DC Keyes declined and stated he heard rumors that he was present when the leak occurred. In reference to the rumors, DC Keyes stated:

*What I made mention of was that there were rumors that were put out by somebody prior to me even coming here and being served, that I was in a room where – where I was around when it happened. Or I was around when it happened and I gave it to Cedric Gutter, I think that's what I said. I was around when it happened and I gave it to Cedric Gutter and I don't know what that was, was a disk or whatever the case may be or what it was but I did say that to him. I think I said that to him.*

DC Keyes stated he heard the rumors from Lieutenant Marci Conrad.

DC Keyes stated transparency in law enforcement is important, but there are times when transparency is not practical. As an example, DC Keyes stated internal investigations should not be released until the investigation is completed. In the opinion of DC Keyes, the department was not transparent in the Officer Martin investigation. With this opinion, DC Keyes does not believe transparency in the Officer Martin case would have helped externally, but internally it would have helped. If the decision to release Officer Martin's body camera was his decision, he would have released the video.

Deputy Chief Keyes was knowledgeable of "G-File" information. He stated "G-file is it doesn't get released to the public and G-file realistically probably shouldn't even be released to the officers." With this statement, DC Keyes acknowledged he talked to Lieutenant Elgin about the 2013 case involving Officer Martin because Lieutenant Elgin was in the review process and had knowledge of the case. He discussed the case with Lieutenant Elgin and voiced disappointment with the discipline in the 2016 Officer Martin case.

DC Keyes discussed his thoughts on the discipline given to Officer Martin on the 2016 case. DC Keyes did not agree with the discipline rendered by Chief Fitzgerald. He was "frustrated" when Chief Fitzgerald did not take his advice. Although DC Keyes was "frustrated" with the discipline given to Officer Martin, he did not "leak" any documents.

Page 44 of 93

In reference to the investigation relating to the release of documents, DC Keyes stated his thoughts were the investigation needed to start at the top and work down. As the investigation unfolded, Deputy Chief Keyes identified he was the "Deputy Chief of Internal Affairs" and had a conversation with AC Pridgen soon after the documents were released. From his recollection, the advice and comments offered by AC Pridgen was,

"we can look into it..." and "it's gonna make us look bad...."

Detective White asked DC Keyes if AC Pridgen's reaction to the released documents was suspicious. DC Keyes replied,

"I think it needs to be questioned."

In this interview, DC Keyes again would not offer his opinion on what should happen to AC Pridgen for releasing the information. DC Keyes did not know why AC Pridgen would not offer a reason why DC Keyes was not involved. Regardless of the investigative details, it is apparent DC Keyes still respects AC Pridgen.

Detective White again focused on DC Keyes' personal phone. DC Keyes stated he would permit Detective White to examine the text messages between Lieutenant Gutter, Lee Merritt, Jasmine Crockett, and AC Pridgen. As DC Keyes was going through his phone, he stated the text messages he has with Ms. Crockett and Mr. Merritt should be on his city phone. He then stated Lieutenant Gutter was his friend and he did not want to betray his trust, so he declined to show the text messages between him and Lieutenant Gutter. Finally, he did show Detective White copies of his text messages between him and AC Pridgen. A review of the text messages by Detective White showed there was no conversation about the investigation. Because DC Keyes would not allow Digital Forensics to download his phone, investigators were not able to establish if DC Keyes deleted text messages.

DC Keyes explained to AC Kraus some of the text messages and AC Pridgen use for fellow command staff members as follows:

DC Keyes and AC Pridgen refer to AC Dean as "popasterous" (*Investigator Note: "Popoasterous" is a word meaning preposterous"*

DC Keyes and AC Pridgen refer to DC Kamper and DC Hadsell as "Hansel and Gretel"

He refers to DC Ramirez as "Charlie Brown"

DC Keyes and AC Pridgen refers to DC Barclay as "Abstract" because he is "clueless"

DC Keyes and AC Pridgen refer to Captain Pitt as "Remix" because when they tell him to do something they have to tell him again.

DC Keyes stated he has grown tired of his position as a Deputy Chief. DC Keyes is frustrated by the fact he was removed from the investigative process at the onset of the investigation.

Page 45 of 93

investigation. In furtherance, DC Keyes emailed (EXHIBIT 63) a terse message to AGM Washington to inquire why he was removed, but she never responded.

Involved Officer--Assistant Chief Abdul Pridgen #2665

Second Interview

Detective White and AC Kraus met with Assistant Chief Pridgen at the Internal Affairs office and conducted a recorded interview (EXHIBIT 64). Prior to the interview, Assistant Chief Pridgen read and signed an Administrative Warning Statement (EXHIBIT 65). The recorded interview is summarized below.

AC Pridgen has been employed by the Fort Worth Police Department for 24 ¼ years. AC Pridgen served a total of 24 years in the United States Navy. He spent 6 years on Active Duty and 18 years on Reserve Duty. While in the Navy, AC Pridgen stated, "I was a cryptologic technician maintenance which meant I repaired computers with a top secret clearance." In AC Pridgen's career at the Fort Worth Police Department he has served as an NPD Commander, PIO, Intel Commander, Jail Captain, IAD Captain, Patrol Captain, Patrol Deputy Chief, Support Deputy Chief, and Assistant Chief over all three bureaus. Presently, AC Pridgens command includes Internal Affairs. AC Pridgen explained his knowledge of "O-File" protected information as "Stuff that is not disciplined."

On the night of December 21, 2016, AC Pridgen was notified by DC Ramirez about the arrest involving Jacquelyn Craig. AC Pridgen did not respond to the jail because DC Keyes went. AC Pridgen stated DC Keyes responded because he thought Chief Fitzgerald said, "...(w)e need to go down there."

While DC Keyes was at the jail, AC Pridgen had several conversations with him. AC Pridgen said he spoke with DC Keyes about releasing Jacquelyn Craig and general conversation about Kim Cole and Dominique Alexander. AC Pridgen stated he met Dominique Alexander several years ago in Arlington. AC Pridgen could not remember any conversations with Mr. Alexander between the time he met him and the night of the Craig arrest.

In reference to Lee Merritt's presence at the jail, AC Pridgen said it was not his decision to let him in the jail and he did not know who made the decision. AC Pridgen also discussed the conversation about Kim Cole. AC Pridgen stated Ms. Cole was on the first floor of 350 and when Mr. Merritt stated he did not need her assistance, AC Pridgen told Mr. Alexander. AC Pridgen stated he did not contact any city attorney. He also stated he initially did not know Mr. Merritt was inside the jail, but when he learned, he did not think anything about it. AC Pridgen stated it did not strike him as "odd" because he was thinking about the "entire situation."

AC Kraus asked AC Pridgen about the day his computer was confiscated and the subsequent analysis of his computer. AC Pridgen did not recall if the was in his office when his computer was confiscated and he did not remember if the was working on his computer. After the search of his computer, AC Pridgen realized Internal Affairs failed to collect several

jump drives in his desk. After finding the jump drives, AC Pridgen notified Captain Pitt who collected them.

AC Pridgen stated it is a violation of the city's computer use policy to share a network password. AC Pridgen stated it was a violation and he has shared his password with Nichole Garcia. AC Pridgen does not recall requesting the 2016 case involving Officer Martin. AC Pridgen also does not recall viewing the Officer Martin case when he received it. AC Kraus pointed out he viewed 15 different attachments and spent 49 minutes reviewing the case. After being provided these facts, AC Pridgen stated, "I truly do not remember that. I don't. And going through my phone on that day-- not only was I [redacted] birthday but [redacted] so I'm sure there were a lots things on my mind that day."

AC Pridgen was allowed to view the surveillance video from January 18, 2017. After viewing the video, AC Pridgen still could not provide any details about what occurred in his office. AC Pridgen stated he viewed his phone and knew he was "texting" [redacted]. AC Kraus asked AC Pridgen, "Did Vance at your computer for 21 of those 25 minutes?" AC Pridgen replied, "No." AC Kraus asked AC Pridgen about January 20, 2017. AC Pridgen stated he was out of town. AC Kraus pointed out he submitted his time sheet (EXHIBIT 60) which showed he was at work for eight hours. AC Pridgen replied, "Guess I have to correct it."

AC Kraus asked about Leotitia Brown emailing AC Dean's discipline recommendations to AC Pridgen. AC Pridgen did not recall receiving the email but was familiar with AC Dean's discipline recommendations. AC Pridgen does not remember how he learned of the discipline.

AC Pridgen stated in the interview, "I don't even know what was released. I didn't-- I have - I haven't even seen what's released." Throughout the interview, AC Pridgen adamantly denied releasing any documents and having any participation in the release of documents. AC Pridgen stated he would not be responsible for confidential information if someone takes it from his office.

AC Pridgen conceded to the fact he downloaded the released documents. With this agreement, AC Pridgen stated, "...my intent was at some point to download that so that the chief could review it and provide to others at city hall that maybe were unaware of what was going to happen." AC Pridgen does not recall Leotitia Brown ever requesting any documents from him pertaining to Officer Martin. Furthermore, AC Pridgen does not ever recall providing Leotitia Brown with any "O-File" information. AC Pridgen also does not remember telling anyone he downloaded documents pertaining to Officer Martin.

AC Pridgen learned of the 2013 case involving Officer Martin from Officer Karl Hodge. After learning of the case, he stated he informed Chief Fitzgerald, however, he did not recall providing any of the case documents to Chief Fitzgerald. Finally, AC Pridgen stated the

name "top heavy" for DC Kamper refers to "...somebody with skinny legs and a big upper body."

Involved Officer-Assistant Chief Abdul Pridgen #2665

Cell Phone download for Open Records Request

Prior to the interview, AC Pridgen gave Detective White his city issued iPhone. Detective White gave the phone to Sergeant Justin Seabourn with the Legal Liaison Unit to process the request. A short time later, Sergeant Seabourn returned to the phone to Detective White and informed him it appeared the majority of the contents on the phone had been deleted. Detective White conducted an administrative search of the phone and found it no longer contained any contacts and only had four text messages ranging from March 8, 2017 to March 10, 2017.

Wednesday, March 22, 2017

Involved Officer-Deputy Chief Vance Keyes

Transcript Review

DC Keyes arrived at Internal Affairs to review the transcripts from his interviews on February 17, 2017 (EXHIBIT 67), March 1, 2017 (EXHIBIT 68), and March 10, 2017 (EXHIBIT 69). After reading the transcripts and listening to a recording of the interview, DC Keyes signed a Recorded Conversation/Deposition Affidavit (EXHIBITS 70-72) for each of the interviews.

Involved Officer-Assistant Chief Abdul Pridgen

Transcript Review

AC Pridgen arrived at Internal Affairs to review the transcripts from his interviews on March 2, 2017 (EXHIBIT 73), and March 10, 2017 (EXHIBIT 74). After reading the transcripts and listening to a recording of the interview, AC Pridgen signed a Recorded Conversation/Deposition Affidavit (EXHIBITS 75 and 76) for each of the interviews.

Sunday, March 26, 2017

Involved Officer-Deputy Chief Vance Keyes

Commendations and IA History

DC Keyes' Internal Affairs history (EXHIBIT 77) and commendations (EXHIBIT 78) were retrieved and attached to the administrative case.

Page 45 of 93

Involved Officer-Assistant Chief Abdul Pridgen

Commendations and IA History

AC Pridgen's Internal Affairs history (EXHIBIT 79) and commendations (EXHIBIT 80) were retrieved and attached to the administrative case.

Monday, March 27, 2017

Witness-Sergeant Rick Van Houten

Interview

Detective White met with Sergeant Van Houten at the Internal Affairs office and conducted a recorded interview (EXHIBIT 81). Prior to the interview, Sergeant Van Houten read and signed an Administrative Warning Statement (EXHIBIT 82). The recorded interview is summarized below.

Sergeant Van Houten is the President for the Fort Worth Police Officer's Association (FWPOA). Sergeant Van Houten stated he had no access to any of the documents pertaining to Officer Martin. Sergeant Van Houten stated he did not release any documents to an outside source. Sergeant Van Houten stated even if he had access to the documents he has no motivation or reason to release any documents relating to Officer Martin. Furthermore, Sergeant Van Houten's motivation would be the "opposite." As the President of the FWPOA it is his duty to protect Officer Martin's "due process rights" and Officer Martin who was "egregiously" harmed by the release of the documents. Sergeant Van Houten stated approximately one month ago he was confronted by Kyev Tatum about releasing the duty status of AC Pridgen and DC Keyes. Sergeant Van Houten told Mr. Tatum he did not release the information and it was a "lie."

Digital Forensic Lab report

When AC Pridgen submitted his city owned cell phone to Internal Affairs to process the open records request filed on March 3, 2017, Sergeant Seabourn noted there was minimal data on the phone. Detective Bruno took the phone to the DFL for analysis. Detective Kiser forensically analyzed (EXHIBIT 83) AC Pridgen's city owned cell phone and found it had been "factory reset" on March 6, 2017, at 0829 hours.

Tuesday, March 28, 2017

Witness-Dominique Alexander

Interview

Detective Lamond met with Dominique Alexander at the Internal Affairs office and conducted a recorded interview (EXHIBIT 84). The recorded interview is summarized below.

Page 46 of 93

Dominique Alexander met AC Pridgen two or three years ago when they sat together on a panel at the University of Texas at Arlington. On the night of December 21, 2016, Mr. Alexander made contact with Chief Fitzgerald in reference to the arrest of Jacqueline Craig. He was inquiring as to the status of Ms. Craig and her family members, and Chief Fitzgerald directed Mr. Alexander to correspond with AC Pridgen.

Mr. Alexander said that he met Chief Fitzgerald sometime in December, 2016, before the arrest incident of Jacqueline Craig. Besides Chief Fitzgerald and AC Pridgen, he doesn't have open communication with any other members of the command staff. Lee Merritt was an attorney who had a relationship with Mr. Alexander's organization, the Next Generation Action Network. On December 21, 2016, Merritt contacted Mr. Alexander about the Facebook video of the arrest of Jacqueline Craig and her family members by Officer Martin. Mr. Alexander sent Merritt to the jail to conduct a welfare check on the Craig family, with the understanding that another attorney would be responding as well. This is because Merritt doesn't hold membership in the Texas Bar, and therefore couldn't be the lead attorney on the case. Attorney Kim Cole went to 350 W. Belknap as well, with the intention of going to the jail to be involved as well in the meeting with the Craig family.

In the early morning hours of December 22, 2016, Mr. Alexander and Assistant Chief Pridgen had a series of phone calls where Mr. Alexander was inquiring as to the status of the Craig family, and asking AC Pridgen to facilitate Kim Cole being admitted to the jail to join Merritt. In the middle of the phone calls with Mr. Alexander, AC Pridgen asked DC Keyes if Merritt would allow Kim Cole to join him, but Merritt declined. Mr. Alexander said this behavior by Merritt amounted to "grand-standing" and was designed to cut the Next Generation Action Network out of the publicity. He further described that as a result of Merritt's handling of this case, the relationship with Next Generation Action Network has been severed. On December 23, 2016, Mr. Alexander had another phone call with AC Pridgen where they discussed concepts about the disciplinary process and whether Officer Martin could be fired for this incident.

On January 17, 2017, Mr. Alexander and AC Pridgen spoke again about the case. During this phone call, AC Pridgen shared with Mr. Alexander that Fort Worth Police Department commander recommended discipline for Officer Martin that they considered to be light. Mr. Alexander didn't know the name of the commander, but described him as a white male with a bald head, and it was determined he was referring to AC Dean.

Mr. Alexander described the occasion where Merritt and Jasmine Crockett held a press conference into the Officer Martin case, and the associated leak of information. This is the press conference, found on YouTube, in which Merritt imbedded a link to the leaked documents. Mr. Alexander said he was present at the filming of the press conference, but hadn't been told prior to the filming what the nature of the press conference would be. He disagreed with the public release of the documents in this way, and chose to stand out of the

view of the camera because he refused to support the measure. While Mr. Alexander believes the documents would have been released eventually, and believes they should be made public, he thinks the personal identifying information which was contained in the leaked material should have been redacted. He acknowledged there are certain members of society who would seek to hurt a police officer, and that the information that Merritt made public would facilitate harming a police officer.

Mr. Alexander said he believes the person who leaked the information to Merritt did it for the purpose of making the Chief of Police look bad. He believes Merritt was used as a pawn by the person who leaked the material. Merritt told Mr. Alexander he received the information in an e-mail.

Captain Pitt

IOC

Captain Pitt prepared an IOC (EXHIBIT 85) about the administrative searches of AC Pridgen's office. The IOC is summarized below.

On February 2, 2017, Captain Pitt sent an email to all personnel who had their city computers confiscated instructing them to submit any USB device that had "ever" been used with or plugged in to a City of Fort Worth computer. Ten minutes later, AC Pridgen sent a response to Captain Pitt stating there were "some" USB devices in his desk drawer that were not collected during the initial search. Captain Pitt went to AC Pridgen's office and conducted another administrative search. In the top desk drawer in the middle of the pencil tray, Captain Pitt discovered three (3) USB devices. These devices were in plain sight and not present when Captain Pitt conducted his initial administrative search of AC Pridgen's office.

Wednesday, March 29, 2017

Witness-Deputy Chief Charles Ramirez #2581

Interview

Detective White met with Deputy Chief Ramirez at the Internal Affairs office and conducted a recorded interview (EXHIBIT 86). Prior to the interview, Deputy Chief Ramirez read and signed an Administrative Warning Statement (EXHIBIT 37). The recorded interview is summarized below.

On December 21, 2016, DC Ramirez saw a video involving Officer Martin arresting Jacquelyn Craig and her two daughters. After seeing the video, he forwarded the video to Chief Fitzgerald and AC Pridgen. DC Ramirez had a discussions with AC Pridgen about the video. In the discussions, AC Pridgen voiced he thought the arrest of Jacquelyn Craig

and her two daughters could be classified as an "illegal arrest." Additionally, AC Pridgen expressed concerns and seemed upset by Officer Martin's actions. Shortly after the documents relating to Officer Martin were illegally released, DC Ramirez spoke with AC Pridgen. DC Ramirez remembered telling AC Pridgen the list of people who had access to the documents was small. AC Pridgen did not go into detail, but told DC Ramirez an investigation was underway.

**Witness–Officer William Martin**

**Interview**

Detective White met with Officer Martin at the Internal Affairs office and conducted a recorded interview (EXHIBIT 93). Prior to the interview, Officer Martin read and signed an Administrative Warning Statement (EXHIBIT 99). The recorded interview is summarized below:

Officer Martin has seen the illegally released documents online and in various news stories. Officer Martin saw a copy of his written statement to Internal Affairs and it included his home address, personal cell phone number, and birthday on Merritt's Youtube page. The home address published online is Officer Martin's ███████████████████████ When Officer Martin viewed the video, he noticed there were approximately 2,500 views.

From December 24, 2016, to present, Officer Martin has seen numerous comments threatening his life on various websites. Officer Martin's attorney told him the "Black Panthers" called the Department and they intended to "kill" him. The illegal release of his documents have impacted his personal life. ████████████████████████████████ █████████████████ is waking up from nightmares of people ██████████████████████████████████████ Officer Martin is ██████████████████ and is coming to his house and "shooting" them. Officer Martin ███████████████████████████ having a ███████████████████ as his ███████████████████ In addition to having Officer Martin ████████ he has had friends who will not come to his house. His ██████ continues to come to his house, but they are "nervous." After the initial incident in December 2016, Officer Martin declined a request to have a guard detail at his house. However, once he learned of the release of documents, a guard detail has been established at his house.

**Thursday, March 30, 2017**

**Witness–Assistant Chief Pridgen**

**Interview discrepancies/anomalies**

Based on the two interviews conducted with AC Pridgen, several discrepancies and anomalies were identified. Below is a summary:

**First Interview (first interview)**

(95) Detective White–"...when you're ordered to take a polygraph about the documents bein' released, what will the results show?"

(96) AC Pridgen response in his first interview–"I don't know. I can tell you I didn't release them. I didn't give them to anyone to release. But after having done research on the illegitimacy of polygraphs, it's hard for me to go in there with a positive opinion when I specifically was doin' research to – for the Chief to do a council presentation on why we shouldn't be using polygraphs, and you got departments all across the country saying that they're junk science. And that's what the literature indicates. So I don't have a problem taking one, but I don't know what the results will be, based upon what I know to be the flaws with polygraphs."

Polygraphs are still used throughout the policing profession and have been for years.

(128) Detective White–"...do you remember when – approximately when you found out about the arrest of (Jacqueline Craig) and her – uh, her daughters and, uh – by Officer (Martin)?"

(132) AC Pridgen–"It was about 10 o'clock at night."

(145) Detective White–"Did you notify anybody after reviewing that video or being contacted by DC (Ramirez)?"

(148) AC Pridgen–"Mm-hm."

(150) Detective White–"Okay. Do you know who you notified?"

(152) AC Pridgen–"I don't know if the Chief was included in that text message. I can't remember, but – and I don't know whether I called the Chief and told him or sent it to him. Can't remember, but I told, uh – I think I might've sent messages to Paula and to Marc Povero saying – Paula Fimbres and Marc Povero saying, "You guys need to get a news release ready indicating that this is gonna be under investigation and, you know, yada yada." Without giving any details. 'Cause I knew this was not going to be a run-of-the-mill case."

AC Pridgen remembers who told him about the event and his responding correspondence and specific directions for the PIO Team, but he does not recall telling Chief Fitzgerald. Additionally, this is an example of how AC Pridgen has specific recollection about one part of the Officer Martin event, but he does not remember downloading any documents on January 18, 2017.

(171) Detective White–" Okay.  Do you recall who told you about the – the 2013 cases involving Officer (Martin)?"

(174) AC Pridgen–" Believe it was Karl Hodge."

(176) Detective White–" Do you know how he knew about it?"

(178) AC Pridgen–" Probably through whoever his supervisor was at the time.  I can't remember her name."

(191) AC Pridgen:" I think Tonya McMah."

On January 5, 2017, AC Pridgen and DC Keyes have a text message exchange identifying Sergeant McMath as Officer Martin's supervisor in 2013.

(236) Detective White:"... did you turn all – over all storage devices that were used in your city computer?"

(239) AC Pridgen:" All the ones were – that ones in my office are the only ones that I use on city computers. So when I say I tu- you tu- I turn them over, they came back and got some more that were in my desk drawer that they must've overlooked when they came in the first time."

Captain Pitt stated he did not overlook the three (3) USB devices in his initial search. When he conducted a additional administrative search pursuant to AC Pridgen notifying him, he noticed the three (3) USB devices in AC Pridgen's desk were not there during the initial search.

(379) Detective White:" So based on that, we had them conduct a more detailed examination of your computer, and what we found was that on January the 18th that, uh – starting at approximately 1815 hours, uh, the documents that were released were downloaded from your computer onto an I:\ Drive."

(384) AC Pridgen:"Mm-hm."

(386) Detective White:"So basically an ex- external storage device was connected to your computer."

(388) AC Pridgen:"Mm-hm."

(390) Detective White:" Um, and that was w- a thumb drive that we've never got. A thumb drive and/or an external hard drive that we have not got yet.

(393) AC Pridgen:"Okay."

AC Pridgen never denies the download occurred from his computer. He never denies the documents were downloaded to a USB device on his computer. Finally, he does not deny the fact the USB device was not submitted.

(390) Detective White:" One of the other things is the date – the – the documents that ended up on Lee Merritt's Dropbox are – I mean, I – I understand what you're sayin', but the – the metadata on those documents conclusively show that the documents on Lee Merritt's Dropbox came from your computer."

(593) AC Pridgen:" I will tell you I never took that thumb drive out of the office. On the 18th was the day – 'cause I looked at my calendar. It was, I think, a Wednesday. The next day, I had leadership at Fort Worth. So I'm sure there were lots of things I was trying to do before I left. The reason I downloaded that information was based on a conversation I had with Tisa Brown where we were talking about the case and she said, "Once Lee Merritt files his suit, everything in Martin's background's going to be released, including G-file." So I was doing my due

Page 54 of 93

diligence, to try to prepare the department for the onslaught that was gonna come. 'Cause I knew it would, based upon his record, based upon the – the – the, uh, body-worn camera..."

(608) AC Pridgen:"... and I did not take that thumb drive out. I left. Didn't come back 'til the following week, and you guys probably don't know what it's like, but my plate is overflowing. So this didn't come back to my attention. I didn't even recall downloading it 'til I – I saw that. But I know my intent was to, but I don't recall downloading it..."

(641) Detective White:" So do you – you recall downloading the documents to the thumb drive?"

(643) AC Pridgen:" What I'm telling you is I don't. My intent was to, and if you saying I did, then I probably did. But on the 18th, I was doin' a bunch of stuff. Not just reviewing that."

In this reply, AC Pridgen had vivid recall of January 18, 2017. Importantly, AC Pridgen admits to downloading the information based on a conversation he had with Tisa Brown and provides further reason when he states he was trying to prepare the department for the "onslaught." However, a short time later he changes his statement and says he does not recall downloading the information, but he does admit to "reviewing" the information.

(651) Detective White:"...we know 100% for sure, without a doubt that the documents that Lee Merritt obtained without the department's consent came from your computer."

(655) AC Pridgen:"Okay."

(668) AC Pridgen:" Listen, I'm not a conspiracy theorist. I don't know how to explain it, but what I do know is I never took any thumb drive out of the office. Because I don't take my work home, and my intent was to share it with the Chief. Maybe he could share it with – with city leaders, because I don't think they r- really look at this as anything that was my – you know, was gonna be big. I never took it out of the office. 'Cause I don't take things out of the office. I don't, and I knew I was leaving town, and I wouldn't have."

AC Pridgen offers no denial. We already identified the fact it came from his computer, he was in the office, and IAD never received the USB device. AC Pridgen only states his intent was to give the information to Chief Fitzgerald.

(891) Detective White..."how else do we explain it when..." (This question was in reference to how could it be explained the documents downloaded on AC Pridgen's computer, later ended up in Merritt's possession."

(894) AC Pridgen:" All I can tell you is what I was doing was in the course and scope of my responsibilities, based upon a conversation I had. My intent was to provide that information to the Chief and to others. I did not take that thumb drive out of my office. I did not. I don't know how he got what he got, but he didn't get it from me, and he didn't – didn't get it through me."

For a second time, AC Pridgen admits to downloading the document and provides the reason of giving the information to Chief Fitzgerald.

Page 55 of 93

(982) Detective White:" I think you submitted six or seven, but the thumb drive that contained the documents that Lee Merritt was -- we never got that thumb drive, and we know that thumb drive was plugged into your computer, because it – not only does it create that metadata trail, it also logs the serial number."

(987) AC Pridgen-"Okay."

AC Pridgen offers no objections when presented with this information.

(1039) Sergeant Mendoza-"Does the Chief know about, you know, why you would have downloaded it? Did the request you to download it?"

(1042) AC Pridgen-"No."

Chief Fitzgerald never requested the information from AC Pridgen.

(1178) Sergeant Mendoza-" I can't really comprehend what would be the reason to even put it – any of that information on a thumb drive."

(1181) AC Pridgen-" To give it to the Chief, 'cause he doesn't have Blue Team. Nobody at City Hall has Blue Team. No different than me copyin' a video from Backgrounds to provide to David Cook."

(1185) Sergeant Mendoza-" But the Chief had the 2016 case, and he was in the review process."

(1187) AC Pridgen-" No..."

(1189) Sergeant Mendoza-" At that – that point on the 18th, uh, (9davin) had already served eight of ten days of the suspension."

(1192) AC Pridgen-" Right. Based upon the conversation I had about what would be released. I don't know that people at City Hall, or the Chief, knew this stuff was gonna be released. And it's different when you see it, as opposed to when you hear something."

(1198) AC Pridgen-" So my intent, based upon our conversation – and I can't remember what we discussed – was, 'I need to share this with him.'

(1201) Sergeant Mendoza-" The 2016 case specifically? Or what?"

(1203) AC Pridgen-" Everything. The – the 2013 and the 2016."

(1205) Sergeant Mendoza-" The complete case files?"

(1207) AC Pridgen-" I can't remember. But I know it was all the relevant information, and I can't remember what that would've been. But that was my intent."

Several discrepancies occurred in this portion of the interview. First, Chief Fitzgerald does have access to Blue Team and knows how to use the software. Every administrative case is

sent to Chief Fitzgerald when it is sent to the chain-of-command. Second, Chief Fitzgerald was assigned the case on January 4, 2017, so he already had access to the documents. Third, there are steps to present (g) file information to city officials outside of the department. Before the information is privy to release, the CM must complete a letter describing who has access to the information. AC Pridgen was a Captain over Internal Affairs in the past and the Assistant Chief over Internal Affairs when this task occurred and should have at the minimum a working knowledge of how to release (g) file information. Finally, he never shared the information with anyone and nobody ever requested him to retrieve the information.

(1227) Sergeant Mendoza-" You don't remember downloading anything to a thumb drive?"

(1239) AC Pridgen-" I know that was my intent, and I can't remember whether I did or not. I really can't. Just like – I go back to that example, but what I gave David – I can't remember whether I downloaded a video, because I have access to view videos from Backgrounds, or whether I got it from somebody else."

This is another example of AC Pridgen stating he does not remember. This is also another example of when he mentions giving a video to David Cook. He refences a background video in comparison to (g) file protected information. A background video is not the same as (g) file protected information.

(1320) Detective White-" Do you think (Nicole), using your sign on, uh – well, I mean... "

(1322) AC Pridgen-"No."

(1438) Detective White-" Do you think Deputy Chief (Keyes), um, took that thumb drive without your knowledge and released it to (Lee Merritt)?"

(1441) AC Pridgen-" I don't think he would do that."

(1443) Detective White-" Is it a possibility?"

(1445) AC Pridgen-" Anything's a possibility. Anybody who was in my office, even with me in there, could potentially have done it. If I wasn't payin' attention. So...."

AC Pridgen did not let Detective White finish the question of, "Do you think Nicole, using your sign on could have released the information?" AC Pridgen was quick to respond with "No" when asked this about his administrative assistant and Latitia Brown, but when asked this about DC Keyes he would not respond in the negative. If anything is possible then it is possible for his administrative assistant to Latitia Brown to release the information. Furthermore, by providing his sign on to his administrative assistant, he violated the General Orders.

(1507) Detective White-" So were you the person or was Vance the person that saved the stuff to the Drive on that – that evening?"

(1510) AC Pridgen:" Well, I was at my desk, so it would've had to been me. 'Cause he wasn't at my desk,"

(1513) Detective White:" Okay. So Vance, uh, was just sittin' off to the side of – your PC is set up kinda sideways?"

(1516) AC Pridgen:"Yeah."

AC Pridgen admits to downloading the information. Furthermore, although he has previously stated numerous times he did not recall downloading the information, he remembers DC Keyes sitting next to his computer.

(1600) Sergeant Lawrence:" First of all, did you download the video?"

(1602) AC Pridgen:"Yes."

(1606) AC Pridgen:" Based upon what they've told me, because I can't recall."

(1648) Sergeant Lawrence:" So then you – you view the document. In this case, that didn't happen. In this case, it was downloaded to an iDrive – a thumb drive..."

(1651) AC Pridgen:"Mm-hm."

(1653) Sergeant Lawrence:" and it was viewed. It was opened, and that changed the metadata inside the file. And then it created some – some link files on your computer, showin' that you had done that. So if it's downloading all this stuff to the thumb drive, you have to plug a thumb drive into it. That wouldn't be normal. So did you plug the thumb drive in?"

(1659) AC Pridgen:" What I'm saying is that I must have. My intent was to download it to a thumb drive. So I'm not disputing that it i- it...."

(1666) Sergeant Lawrence:" So we agree that you did download it?"

(1668) AC Pridgen:"Yeah."

(1690) Sergeant Lawrence:" The one that went to Lee Merritt has the same unique serial number, but it has a different revision. The date and time that file was changed is the exact second you downloaded it. So we know it came from your thumb drive."

(1694) AC Pridgen:"Okay."

(1696) Sergeant Lawrence:" So that thumb drive is – is missing."

(1698) AC Pridgen:"Okay."

(1700) Sergeant Lawrence:" And you were asked for all your thumb drives."

(1702) AC Pridgen:"Right."

(1704) Sergeant Lawrence:" Did you forget about this one?"

(1706) AC Pridgen:" Well, like I said, I didn't recall downloading it, but if the evidence indicates I did – that was my intent."

AC Pridgen initially admits to downloading the information to Sergeant Lawrence. He was presented with the fact that the documents uploaded by Lee Merritt came from his computer and his response was "Okay."

(1774) Sergeant Mendoza:" So I don't really see the urgency there, you know? No one's askin' for it. What's the need of puttin' it on a thumb drive?"

(1777) AC Pridgen:" Based upon the conversation I had with her, and sometimes things pop up in my mind. Like, "Oh, yeah. I'm needlin' to do this," and if I don't do it then and there, I'm gonna forget. So – and with her saying what she said about this particular incident and this stuff being released, my intent was to share the information. And, like you said, since there was no urgency, that's probably why I forgot about it and didn't think much of it. Because other things had higher priority.



(1846) Sergeant Mendoza:" And what the facts show is that one of y'all two were the – I mean, you're sayin' (Vance) didn't know about what – that you were downloadin'."

(1850) AC Pridgen:"I don't believe he did."

(1855) Sergeant Lawrence:" Who did you tell that you downloaded the files?"

(1857) AC Pridgen:" I don't know if I told anybody. I can't remember telling anybody."

(1919) Sergeant Lawrence:" Did you tell any- did you tell anybody you downloaded that data?"

(1921) AC Pridgen:" I don't know whether I did or not. I really – this is not something that is, like, earth shattering. That if I would've done that, then I would've shared. You know what? I'm gonna X, Y, and Z. That's not something I would remember, because I'm not breakin' the law, and I'm not violatin' the law."

This is another example of where AC Pridgen admits to downloading the released information.

(2255) Sergeant Lawrence:" ... we're still down to the fact that it came from your computer."

(2255) AC Pridgen:"Okay."

(2257) Sergeant Lawrence-" And th- that you downloaded it."

(2259) AC Pridgen-"Okay."

AC Pridgen continues to admit he downloaded the information

(2221) Sergeant Lawrence-" Did you give it to the Chief on that thumb drive?"

(2323) AC Pridgen-"Nope."

AC Pridgen stated he intended or did download the information for Chief Fitzgerald. However, he never provided the information to Chief Fitzgerald.

(2331) Sergeant Mendoza-" When the Chief needs somethin', he has a – a – a folder that only him and the Lieutenant and – there's three pre-. I mean, he asks for anything and we drop it in that folder, and it's there for him. I mean, he had – he has access to everything. He had the 2016 case.

AC Pridgen is the AC over Internal Affairs and should know about the folder the Chief has access to in regards to cases for his review.

(2336) AC Pridgen-" I don't know that he had access to everything. I don't know that he did. If you're saying he did, okay. I'm doing what I believe is my due diligence, to make sure that he's fully aware of everything that's going to come his way in relation to this case."

(2341) Sergeant Lawrence-" Then why didn't you give him the thumb drive?"

(2343) AC Pridgen-" Because I did not think about it after leaving that evening. Again, I'm telling you – you say I downloaded it? Cool. I – my intent was to. There are things that take precedence. There are – I – I can't tell you how many situations where I was going to do something and did not. Many instances and far greater consequences than this. Two years ago, I had a conversation with the mayor and (David Cooke) about discrimination, disparity. I was supposed to have a conversation with (David Cooke) privately to talkin' about – it never happened. That's the most important thing that I could possibly do this week, and it didn't happen."

The information was important and he felt obligated to provide the information to Chief Fitzgerald. Yet he never followed through.

(2490) Detective White-" How would it help the department to have (Kim Cole) show up at – at – or – or be a part of the process from the moment, or...."

(2493) AC Pridgen-" I don't even know who she is. I don't know she's an activist. I don't know who she works for. All I know is they said – (Dominique Alexander) said, "Can (Kim Cole) come down? She works with (Lee Merritt)." I don't know who she is."

Basic research supports the fact Kim Cole is an activist and is involved in litigation with another city for a similar incident. AC Pridgen did not do his due diligence in determining if Kim Cole was an attorney or what her role was that night. He took Dominique Alexanders

word only. AC Pridgen did not contact a city attorney that night to protect the interest of the city.

(2981) Detective White-" Did you tell anybody else that that information was in your office?"

(2983) AC Pridgen-" I don't know. I don't think I did, but I really don't know."

This is another example of AC Pridgen admitting to downloading the information.

(3061) Detective White-" So, uh, Deputy Chief (Keyes) did not, that you know of."

(3063) AC Pridgen-"Right."

(3065) Detective White-"Is there a possibility?"

(3067) AC Pridgen-" Anything's possible, but I don't know that he saw anything about what I was doing. Anything is possible."

This is another example of AC Pridgen admitting to downloading the documents.

Second Interview (line number)

(150) AC Kraus-" what was your specialty in the Navy?"

(152) AC Pridgen-" I was a cryptologic technician maintenance which means I repaired computers with a top secret clearance."

(155) AC Kraus-"... how long did you spend in the Navy?"

(157) AC Pridgen-"24 years, 6 active, 18 in the reserves."

AC Pridgen was in the Navy for 24 years and held a top secret clearance. With a top secret clearance and the Assistant Chief of Police over Internal Affairs, AC Pridgen knows the importance of keeping information confidential.

(400) AC Kraus-"... was it Dominique that asked you about getting (Kim Cole) in there?".

(403) AC Pridgen-"Mm-hm, yes."

(411) AC Pridgen-"(Vance) asked (Lee) if she could come down. He said no and I told Dominique no. I don't know whether she went down there or not."

(414) AC Kraus-" Okay, so she wasn't at the jail tryin' to get in, you don't even know if she went to the jail?

(417) AC Pridgen-"She was on the first floor at 350."

In regards to downloading the documents, AC Prüdgen responded 17 times he could not recall downloading any documents on January 18, 2017. However, almost one month prior on December 21, 2016, he has vivid recollection of the events.

(419) AC Kraus-" Did you talk to (Vance) at all about contacting a city attorney?"

(423) AC Kraus-"... for letting defense attorneys in the jail to talk to people."

(421) AC Prüdgen-"For what?"

AC Prüdgen and DC Keyes facilitated Merritt to enter the jail and also were going to allow Kim Cole to enter the jail. However, neither of them contacted an attorney for the City of Fort Worth. This displays neither were operating with the best interest of the City of Fort Worth in mind. Furthermore, AC Prüdgen was at one time a "Jail Captain." The City of Fort Worth does not have a jail facility which accommodates attorney's to visit their clients.

(449) AC Kraus-" What was the thinking on – on going to the magistrate and seeing if we could get them released?"

(452) AC Prüdgen-" Based on the video, the phone video, it didn't look like what he alleged happened happened, but there was no way to conclusively say that."

(455) AC Kraus-" Okay, so did you – did you do more than look at the video from your position?"

(457) AC Prüdgen-"No."

AC Prüdgen and DC Keyes are both command staff members over Internal Affairs. Both, based on experience, have a detailed knowledge of conducting administrative investigations. AC Prüdgen has even taught a course titled "Basic Internal Affairs Investigations" (EXHIBIT 90) through Sam Houston State University on October 21, 2010.

(572) AC Kraus-" When I reached out about confiscating your computer, thumb drives..."

(576) AC Kraus-"... all that stuff, um, you were in your office at the time, is that correct?"

(578) AC Prüdgen-" I don't remember."

(580) AC Kraus-"Okay. You don't remember if you were workin' on the computer?"

(582) AC Prüdgen-"No, I don't remember."

(584) AC Kraus-"Do you remember Captain (Pitt) looking through your office drawers to look for thumb drives and such?"

(587) AC Prüdgen-"I don't remember."

(589) AC Kraus-"You don't remember him doin' that?"

Page 62 of 93

(591) AC Prüdgen-"No, I don't."

An administrative search is a tactic seldomly used by Internal Affairs. This is another example of AC Prüdgen's lack of recollection in regards to a significant event in the case. Lieutenant Noakes was also present when AC Prüdgen's computer was confiscated. Lieutenant Noakes stated when he attempted to confiscate AC Prüdgen's computer, AC Prüdgen was working on his computer. A short time after this conversation, Chief Fitzgerald and AC Prüdgen had a brief meeting. After the meeting, AC Prüdgen told Lieutenant Noakes he could take his computer.

(603) AC Kraus-"... they found out that you had used thumb drives in there recently that we did not get possession of when we collected the thumb drives with that initial search."

(606) AC Prüdgen-"That's not true."

(608) AC Kraus-"That – that is true."

(610) AC Prüdgen-Because - no, no. Because I remember vividly, I opened my drawer and I said, "I can't believe they didn't take these thumb drives." I remember that vividly, that they didn't take those thumb drives."

AC Prüdgen can remember this vividly, but very little else.  Captain Pitt remembers that those thumbdrives were not where AC Prüdgen stated they were.

(614) AC Kraus-"So there were thumb drives that when they checked your computer had been used in your computer recently that they did not take possession of."

(617) AC Prüdgen-"Oh, yes."

(623) AC Kraus-"Okay. And so (Pitt) sent - sent something out to everyone..."

(625) AC Prüdgen-"Yes."

(627) AC Kraus-"... that had their computers taken said, "We need to make sure we get all those thumb drives."

(630) AC Prüdgen-"Right."

(632) AC Kraus-"Did you contact him and let him know?"

(634) AC Prüdgen-"I sent him an e-mail and said, "There were some in my drawer you didn't get.'" He said, "I got 'em."

This is another example of AC Prüdgen recollection.  However, AC Prüdgen's statement "they didn't take those thumb drives" is not factual. Captain Pitt recalled searching the desk drawer on the prior administrative search and the three (3) USB drives were not in the desk.

(653) AC Kraus-"... you've taken the city's cybersecurity online course, correct?"

Page 63 of 93

(656) AC Pridgen-"Mm-hm."

(662) AC Kraus-"...so is it a violated - violation of city cybersecurity policy to share your network computer passwords with others?"

(665) AC Pridgen-" Yes, it would be."

(667) AC Kraus-" And you shared your network credentials with others?"

(669) AC Pridgen-"Yes."

(671) AC Kraus-"And who was that?"

(673) AC Pridgen-"Nicole."

Sharing a network password is a violation of the General Orders. AC Pridgen previously stated Nicole, his administrative assistant, did not illegally release the documents pertaining to Officer Martin.

(683) AC Kraus-"On the night of February 18 or the day of February 18, you requested from (Felicia) the 2016 (Martin) case."

(688) AC Kraus-"Do you remember that?"

(690) AC Pridgen-"I don't remember but if I did, okay. I don't remember."

(713) AC Kraus-" Would it surprise you to learn that you looked at 'em within the - one minute of receiving them?"

(716) AC Pridgen-"Okay."

(724) AC Pridgen-"Okay, I don't remember. I don't."

(726) AC Kraus-"How often as the top guy over Internal Affairs, have you asked to receive a closed investigation for something that's not even in your chain of command?"

(733) AC Pridgen-"Maybe two or three."

(739) AC Kraus-"... but you don't remember that you opened this up within a minute of receiving it from her?"

(742) AC Pridgen-"That was almost two months ago. I do a lot of things and it is very easy not to remember something that is not critical in the scope of my responsibilities. Now, I know when I request things generally, maybe two to three times. That's - 'cause recently we've had some, like, all those people who were going up for promotion, you know, stuff like - so those things stand out 'cause..."

(748) AC Kraus-"This is the (Martin) case. It doesn't stand out?"

Page 64 of 93

(750) AC Pridgen-" Not am looking at it 'cause I've looked at it many times over the course of - from the time this happened to then."

(757) AC Kraus-"... you opened 15 different documents in that case over a 49 minute period of time within one minute of you receivin' the case from Internal Affairs."

(761) AC Pridgen-" I truly do not remember that. I don't. And going through my phone on that day - not only was it ▓▓▓▓▓ birthday but ▓▓ was not well so I'm sure there were a lotta things on my mind that day."

AC Pridgen does not even recall requesting the case from Internal Affairs. However, he recalls requesting other cases related to promotions from Internal Affairs. AC Pridgen can recall his ▓▓ not feeling well on January 18, 2017, but he cannot recall requesting, reviewing, or downloading case documents relating Officer Martin on January 18, 2017.

(827) AC Kraus-" So you were the one that downloaded those items?"

(829) AC Pridgen-"I don't know, and I said I don't recall doing it. I do not."

(831) AC Kraus-"That same day was also the day that Tish e-mailed to you, uh, Assistant Chief Dean's recommendation on the Martin case."

(836) AC Kraus-" Do you remember receivin' that?"

(838) AC Pridgen-"No, they said that at the last interview, I don't remember. But if she did, okay."

(848) AC Kraus-"But you are familiar with his recommendation?"

(850) AC Pridgen-"Yes."

(852) AC Kraus-"Okay. Are you familiar with it 'cause you - you read the recommendation?"

(854) AC Pridgen-"I really can't remember."

AC Pridgen does not recall receiving AC Dean's discipline recommendation. However, eight (8) minutes after he received the recommendations from Latitia Brown, he requested the Officer Martin case from Felicia Grantham.

(856) AC Kraus-" In the last interview you were asked if it's possible that Vance was the one that leaked these documents."

(859) AC Pridgen-"Mm-hm."

(861) AC Kraus-"Your response was, ""Anything is possible but I don't know that he saw what I was doing.""

(864) AC Pridgen-"Mm-hm."

Page 65 of 93

(866) AC Kraus-"Well, that implies that you were doing something."

(868) AC Pridgen-"No, based upon everything that they said, and if you go back, I said, "Well, if you say I did it, okay, 'cause I don't remember.'" So I've done a lotta things that I do. That day was a busy day, everything's on my - so I don't know that he saw me doing that. I don't know that he did. I- it doesn't stand in my mind - out in my mind that him me- sayin' anything, none of that stuff stands out so I don't know that he did see it, and anything is possible."

(894) AC Pridgen-" And I flew out that evening."

(896) AC Kraus-"So you weren't here on Friday?"

(898) AC Pridgen-"No."

(902) Detective White-"On Friday the 20th. And it's showin' 'eight hours of pay."

(904) AC Pridgen-"Guess I have to correct it."

This is another example illustrating AC Pridgen recalled January 18, 2017 and the days after. He remembered it was a busy day. He remembered "Leadership Fort Worth" was the following day and he remembered he did not work on January 20, 2017. When presented with evidence showing he reported he was at work on January 20, 2017, AC Pridgen stated, "Guess I have to correct it." He also stated he does not know if DC Keyes saw him downloading the information.

(968) AC Pridgen-" I don't even know what was released. I didn't - I have - I haven't even seen what's released."

(971) AC Kraus-"You still to date haven't seen what's released?"

(973) AC Pridgen-"I tried finding it, I couldn't find it. So I don't know what's been released."

AC Pridgen, the Executive Chief over Internal Affairs / Open Records does not know what documents have been leaked to an outside source. The leaking of information is a criminal offense yet AC Pridgen as of this interview still does not know the content of what has been leaked. The executor over privileged information should be well aware of the contents released outside of normal procedure and especially when a criminal act has occurred. Lieutenant Fimbres observed AC Pridgen watching the illegally released body camera footage at Tami Wadington's desk on the day of the release. AC Pridgen, the Assistant Chief over Internal Affairs, never asked Captain Pitt about any details or progress in the investigation during the initial stages of employed any concern about the illegal release of the protected documents.

(983) Detective White-" Okay. On the release, what we're lookin' at is not a copy going to Lee Merritt. The original with that serial number attached to the original document that came from your computer o- i- to your I-drive on that external storage device..."

(989) AC Pridgen-"Mm-hm."

(991) Detective White-"...two of 'em is what (Lee Merritt) got. Not copies, the original. And that - that..."

(993) AC Pridgen-"All I can tell you without equivocation, is I did not give (Lee Merritt) or anybody anything. I did not take those thumb drives out of my office. I can tell you that unequivocally."

AC Pridgen again focuses on the USB devices. He knows "unequivocally" he did not give Merritt or anyone else the USB devices, but he cannot recall any specific facts about the case when asked.

(1012) AC Kraus-" As assistant chief, most tenured assistant chief in the department, who's responsible for confidential information that gets downloaded?"

(1015) AC Pridgen-"I'm not responsible if somebody takes it out of my office."

(1017) AC Kraus-"Who's responsible for it?"

(1019) AC Pridgen-"I'm not responsible if somebody takes it out of my office. Many things we all have that are confidential in nature and if your office is closed, I wouldn't hold you responsible if somebody went in there and got it. I wouldn't. Because we all have confidential stuff in our offices a lot."

(1024) AC Kraus-"You don't feel any responsibility in this at all?"

(1026) AC Pridgen-"No. If somebody went in my office and took something, that's not my responsibility. Who would think in a police department that somebody would go in their office and take something? I wouldn't. This is not like I'm leaving it at home or in my car and somebody breaks into my car. This is a secured area."

(1040) AC Kraus-" And even though it's the - you're the origin of the leaked documents, you don't feel responsible?"

(1043) AC Pridgen-"It didn't come from me and I'm not responsible for what's in my office that somebody might come in and take. I'm not responsible for that."

It did come from AC Pridgen, if he would not have downloaded the information to a USB device, the leak would not have occurred. (1046) AC Kraus-" Okay, so who came in and took it?"

(1048) AC Pridgen-"I don't know."

(1050) AC Kraus-"How could anyone have known it was in your office?"

(1052) AC Pridgen-"What I'm telling you is I didn't do it and I don't know who did. I know I didn't, and I- I can't come up with all these hypotheticals of who could have, I know I didn't."

AC Pridgen normally keeps his office locked. This is a fact confirmed by his administrative assistant, Nicole Garcia. AC Pridgen was presented with evidence showing him the illegally released documents came from his computer. Presented with this evidence, AC Pridgen, the Assistant Chief of Internal Affairs and a veteran who had a Top Secret clearance, accepts no responsibility for keeping confidential information secure.

(1155) Detective White-"2013 case, you learned about that from (Carl Hodge), is that correct?"

(1157) AC Pridgen-"Yes."

(1159) Decitve White-"The, uh, text message or a phone call?"

(1161) AC Pridgen-"Might have been a phone call."

(1163) Detective White-"Okay. Did you notify Chief Fitzgerald about the 2013 case?

(1165) AC Pridgen-"Yes."

(1167) Detective White-"Did you provide Chief (Fitzgerald) with any documents from the 2013 case?"

(1169) AC Pridgen-"I don't recall."

AC Pridgen recalled how he learned of the 2013 case and he recalled informing Chief Fitzgerald about the case. However, he does not recall downloading any documents.

(1220) Detective White-"... there are no additional storage devices that you did not submit or inform Internal Affairs about, is that correct?"

(1222) AC Pridgen-"Correct."

AC Pridgen stated he has submitted all USB devices to Internal Affairs. However, the documents that were illegally released to Merritt were downloaded from AC Pridgen's computer to a USB device that has not been submitted to Internal Affairs. AC Pridgen and DC Keys were in the office when this download occurred.

(1315) AC Kraus-"... you ever shared any other private information with (Nicole), like, performance issues with deputy chiefs or anything like that?"

(1318) AC Pridgen-"Not that I can recall."

(1322) AC Pridgen-"Oh, wait a second. Yeah, she sent me a text message, um, asking about I think s - who was gonna be acting for me and wanted information on who - sharing - you know, why I think somebody else would be better as acting."

(1331) AC Kraus-"I mean, were you specific that you can't have this person because I've got this in their past or..."

(1334) AC Pridgen-"I said, "Well, this would be a concern." something along those lines "cause it was about to be a meeting about who was gonna be acting, I think."

(1353) AC Kraus-" So who had the performance issues that you were..."

(1355) AC Pridgen-"Renee. Not performance issues but decision-making.

(1357) AC Kraus-"And were you specific or was it just, "I have problems with her decision-making and"

(1360) AC Pridgen-"I'm pretty sure I alluded to two examples."

(1362) AC Kraus-"Is that part of why she got transferred back whenever she got transferred?"

(1364) AC Pridgen-"It might have been."

Text messages between AC Pridgen and Nicole Garcia show he provided her with two specific examples why Deputy Chief Renee Kamper would not serve in an acting Assistant Chief capacity. First, he cited a time were DC Kamper allowed for "character references" to be included in an administrative case involving an officer alleged of committing DWI. Second, he stated DC Kamper, while over Internal Affairs and the Special Investigations Unit, asked SIU if ▓▓▓▓▓▓▓▓ (a FWPD officer) was being investigated. These factors, according to AC Pridgen "might have been" why DC Kamper was transferred to a different command. This illustrates that it is not an anomaly for AC Pridgen to inappropriately share sensitive internal/investigative information with his administrative assistant.

(1378) AC Kraus-"... there was a reference to Deputy Chief by a nickname, Deputy Chief Kamper.

(1380) AC Pridgen-"Mm-hm."

(1382) AC Kraus-"You familiar with that?"

(1384) AC Pridgen-"I heard it."

(1386) AC Kraus-"You know what it is?"

(1388) AC Pridgen-"Yeah."

(1390) AC Kraus-"Would you share?"

(1392) AC Pridgen-"Yeah, somebody with skinny legs and a big upper body."

(1394) AC Kraus-"Okay. So top heavy?"

(1396) AC Pridgen-"Mm-hm."

In Nicole Garcia's interview, it was clear the name "top heavy" was a sexist and highly inappropriate reference to DC Kramer. AC Pridgen, in the text thread, never discouraged or corrected Ms. Garcia from using the name.

(1490) AC Kraus "Is it possible - and you said you were distracted, ___ was sick, you had Fo- Leadership Fort Worth, you're gettin' ready to go outta town, you don't remember downloading it while you were havin' whatever conversation you were havin' with Vance, is it possible that when you got done you handed the th - the thumb drive to Vance?"

(1490) AC Pridgen-"No, that's somethin' I woulda remembered."

AC Pridgen has recalled no facts about the illegal release of information. He did not remember requesting the cars, he did not remember viewing and downloading the documents, and he does not know what was released. However, he would have recalled if he gave a USB device to DC Keyes on January 18, 2017.

Involved Officer-Deputy Chief Vance Keyes #3195

Interview discrepancies/anomalies

Based on the three interviews conducted with DC Keyes, several discrepancies and anomalies were identified. Below is a summary:

1st interview (line number)

(531) Detective Lamond-"...do you know who (Kim Cole) is?"

(533) DC Keyes-"Kim Cole, is that the attorney"

(535) Detective Lamond-"Mm-hm."

(562) Detective Lamond-"Okay. Knowing that now and looking back that at 2:00 in the morning, while you're at the jail, Chief (Pridgen) offers to insert (Kim Cole) into that conversation - that she was available already - that the relationship was already there, he had access to her, what do you think about (Pridgen)'s involvement in this situation?

(568) DC Keyes-"I wouldn't have done it - I would never..."

When DC Keyes had the text message exchange with AC Pridgen about Kim Cole, it was after he already allowed Merritt to enter the jail. On December 22, 2016, Cole and Merritt were both attorneys for the Next Generation Action Network. DC Keyes allowed Merritt to enter the jail without even knowing he was an attorney. He simply relied on the fact Merritt told the jail without even knowing he was an attorney. As the investigation progressed it was learned that Merritt is not a him he was an attorney. As the investigation progressed it was learned that Merritt is not a licensed attorney in the State of Texas. Therefore, he is not able to represent himself as an attorney in the State of Texas. This was highlighted by the fact that Dominique Alexander, the founder of Next Generation Action Network, knew Merritt was not even allowed to represent clients in the State of Texas.

Page 70 of 93

(674) Detective White-"Have you had any contact with Lee Merritt or Jasmine Crockett?

(676) DC Keyes-"I have had contact with Lee Merritt, ah, from the start - from the very first night that we met him, ah, he gave me his phone number. I put it in, ah, I was the point of contact for him if we were gonna do anything that concerned the Craig family, Chief said unintelligible going to me see if - so I've called him on several occasions. When this stuff happened, I stopped unintelligible even sent to the church - I spoke at a church with Lee Merritt there. I was on TV sitting beside Lee Merritt..."

Without even knowing Merritt, DC Keyes gives him his personal cell number. Although he is "acting as a liaison," DC Keyes surprisingly never contacts Merritt using his city cell phone.

(1064) DC Keyes-"... I've been a Deputy Chief for one year and I'm very, very frustrated. I feel I've aged immensely since I've been in this position. I'm just gonna be honest. I can't keep up - I'm (unintelligible) I can go is non-stop going we're always - do this, do this, do this, go here - and I just can't and so I can't imagine what that would do to a person over a period of eight years. I've got eight years left if I'm here, I don't know what it's gonna do to me. I don't want to be bitter- I don't want to leave here frustrated and angry. I want to leave here like I came..."

DC Keyes states he cannot keep up with his duties as a Deputy Chief.

(1623) Detective Lamond-"... but that's the one document that was not publicized and, you know, if she had recommended heavy it probably would have been or somethin' but it doesn't play into the narrative, you know, that - that a supervisor, you know, went light on their recommendation. I just thought that as an interesting thing that that document was available and they didn't publicize it.

(1629) DC Keyes-"All right, well I didn't know that and I know he said she recommended, um, I think what we said was she - whatever - I don't know what she - I don't remember what she recommended but I think she told us she recommended more than what she did and I think that's what plated Pridgen off was that she said she was - she recommended more than she did. I think that was the case - I don't remember now...."

In the interview with AC Pridgen, he seemed to forget Sergeant McNabb's name. Yet in this interview with DC Keyes, he states AC Pridgen was "pissed" with her discipline recommendation in the 2013 case.

(1801) DC Keyes-"I expect him to come in and say look - despite this that Pridgen will come in here, I did this for this reason, and I didn't involve Vance and Vance didn't know about it - that's what I expect to happen 'cause that's what I know to be true. I don't know what else I can do other than that. I told my ___ I'm like ___ (unintelligible) interview but if I'm in handcuffs, then I guess somebody will call you 'cause I really thought you were gonna arrest me today, and I said I don't know what for but I fully expected to be arrested today. I'll tell you that."

Page 71 of 93

This response from DC Keyes pertains to AC Pridgen admitting to Internal Affairs why he downloaded the documents. In this response, DC Keyes expresses how he thought he was going to be arrested prior to this interview. He highlights this fear by stating how he told his ▮▮ he may be in "handcuffs."

(1938) Detective Lamond:"that you have nothing to hide are things that, one, if we didn't offer or ask those things I think there might be questions to why we didn't and it's - it's a good opportunity for you to - to do what you're wanting to do here today."

(1942) DC Keyes:"... I'm gonna be honest with you 'cause I know you guys think I'm guilty as sin - I want to say no (unintelligible) - I just want to say (unintelligible) - I just want to say no but I don't want to look more guilty than what you guy already think I am."

DC Keyes reluctantly agrees to the idea of taking a polygraph examination.

(2415) Detective White:"What if you were makin' the decision, um, in terms of - of discipline?"

(2415) DC Keyes:"But I'm not..."

(2419) DC Keyes:"...and I'm done because I - man, don't put me in that position."

(2423) DC Keyes:"Don't because I may - people have asked me my opinions on a lot of things, I've made a lot of recommendations and they've not been taken."

DC Keyes was the Deputy Chief over Internal Affairs and would not suggest a recommended discipline for the person responsible for the illegal release of information.

(2452) Sergeant Mendoza:"... going back to the personnel complaint and the day you were served, that's Tuesday evening. Correct."

(2455) DC Keyes:"No that was Wednesday - that was Wednesday evening - about 5:36 p.m. and I was told to come up here. Like I told those guys I called Chief (Pridgen) and I said hey, I 'cause at this point it's a witch hunt for me. I'm goin' down to IA - I'm gonna be served with a personnel complaint and I've got people calling me saying guess what your'e gonna be arrested on Friday - where there's gonna be this big break story and I'm thinkin' why would I be arrested - what did I do but I tell you what when you get a phone call at, um, Wednesday at 5:30 p.m. and people are calling you saying you're gonna be, uh, arrested at (unintelligible) well it kind of makes sense."

(2465) Detective White:"What did he say when you - when you told him?"

(2467) DC Keyes:"Who?"

(2469) Detective White:"Pridgen."

(2471) DC Keyes:"What'd he say. He said just tell the truth. You know you didn't do anything I think or somethin' like that just tell the truth - you know you didn't do anything something like that. It wasn't a long conversation just like but I mean - I got..."

Page 72 of 93

AC Pridgen told DC Keyes to tell the truth because he (DC Keyes) "didn't do anything." At this stage of the investigation, AC Pridgen could not have known if DC Keyes was responsible for the release unless he had personal knowledge of who and how the information was released.

(2622) Sergeant Mendoza:"but with that said did you have the conversation on Tuesday prior - you knew you were gettin' a PC at that point when you called - you hadn't signed anything - you hadn't viewed it..."

(2626) DC Keyes:"No, I did and no because again I'm gonna tell you this is the thing and that - we have known and I think - many conversations I've had with Chief Pridgen is this is a witch hunt and I believe that and I tell you I believe that 'cause on the very first day prior to the investigation starting, the ACM told the Chief to pull me off the case. How an I supposed to feel if you're not conducting an investigation when you said that - I mean I know you guys don't get that but that's (unintelligible) for me - that's very approachable - to have the ACM - the Chief's boss - the Chief comes to me, Vance, I go you're off the case. (Unintelligible) what have I did at that point other than associating with you - placed me workin' for Chief Pridgen. I didn't get a twist when I got promoted so how'd that make you feel seriously they won. They're no investigation - you're being pulled from the case."

DC Keyes and AC Pridgen have both stated they have not talked about the investigation of the released documents with each other. However, DC Keyes contradicts this idea because he describes a conversation he had with AC Pridgen they "have been sayin' this is a witch hunt from the start."

2nd Interview (line number)

(129) Detective White:"... has he talked to you specifically at all, period, about the - the documents being released? Has he ever said anything to you about that?"

(133) DC Keyes:"No, I can't - I'm - I'm tryin' to rack my mind. You said has he ever said anything about documents being - no."

(175) Detective White- But then the release happens and there's nothin'. I mean, to me, the release - you know, that's a big deal. I mean, 'cause....

(178) DC Keyes:"It was a big deal."

(182) Detective White:"...if you agree with what happened to Martin or disagree with what happened to Martin, it's a big deal, because it goes against our culture. I mean, I - y- you know as well as I do. Everybody knows - I mean, that's kind of one of those jaw-dropping things because that takes, um, a lot of effort. It's conniving. Um, so - so the idea of doing it - i- it - it's stocking, and - and so one of the things that - that's difficult to understand is - is that the - the event in and of itself is discussed extensively between you two, but the release - there's no comments at all.

Page 73 of 93

(190) DC Keyes—"I can't explain that. We talked about it in his office. I-like, I'll tell you again and again and again. I am sick of hearing (Martin)'s name, and so I may have text message but I'll be curious to see how many of those text messages that I initiated talkin' about Martin. 'Cause I was sick of hearin'...

(197) DC Keyes—"... Martin's name, and I don't have access, so I don't know. But I'm tellin' you, I was sick and I'm still sick of hearin' Martin's name. And so I – I don't know if we stopped t- I don't know. I – I can't explain that, Jake.

This is an example of how DC Keyes cannot recall any specific conversational details about the illegal release of documents with AC Pridgen. He can recall multiple conversations about the arrest involving Officer Martin, but absolutely nothing about the illegal release of information. AC Pridgen and DC Keyes are both command staff members over Internal Affairs, but they never have a conversation about the release of documents.

(248) Detective White—"... when you found out about the release, do you remember, uh, kinda what you did?"

(255) DC Keyes—"I remember exactly what I did. I w- again, I was in my office. I walked out. I saw – think it was Trey Gibbs and McElroy. They were, "Have you seen this?" "No, I haven't seen it." I immediately went and I tried to find the Chief. Um, I saw Ken Dean. I saw Devon Pitt and can't remember if we talked about it. I think I might've tried to call Pridgen. I don't remember. Or the Chief. I don't remember. I – I don't remember.

DC Keyes can specifically recall speaking with Sergeant Gibbs and Captain McElroy, but he does not remember if he even tried to call his supervisor, AC Pridgen, or Chief Fitzgerald. He previously acknowledged the release of information was a significant event, but he cannot recall reporting the event to chain-of-command.

(337) Detective White—"Do you think Abdul released the information?"

(339) DC Keyes—"I don't want to get into that, because if he did, he did."

(351) DC Keyes—"Listen. I mean, here's the thing, maybe he did, maybe he didn't. He has to own that. I know for certain, prior any of this stuff comin' out – well, and prior to it comin' out. As – as soon as it came out, I was told by Chief Fitzgerald that "The ACM no longer wants you and Abdul Pridgen workin' this case. You're removed." And so before any of this came to light, that made me feel like crap. So I'm not gonna say what another person did or didn't do. You're gonna interview him, and I'm tellin' you I expect him to come in here and tell you exactly what he did."

DC Keyes, even after being told the information came from AC Pridgen's computer, would not implicate AC Pridgen. Furthermore, DC Keyes attempts to change the topic of AC Pridgen's involvement to him being removed from the "case."

(487) Detective White—"... on January the 26th at 8:30 AM, (Abdul) knows that those documents were released. From January 26th until this investigation was in full swing – which was soon thereafter – he never said anything to you? Like, "Man, can you believe somebody released these documents"? Or, "Man, this is gonna make us look bad," or "I'm glad they got released"? What – e- either in support or opposition?"

(493) DC Keyes—"No. He said, "This should've never happened." He just said, "None of this stuff should've ever happened, 'cause we would've – none of this should've ever happened. Like, this should – this shouldn't be happening." And that's to the extent that he ever said anything."

(498) Detective White—"Can you put that in context? So "this shouldn't happen.""

(500) DC Keyes—"As far as, like, the department shouldn't be in – we shouldn't be boin' embarrassed because this happened. We shouldn't be second-guessed because this happened. Citizens, whether they're black, white, or Hispanic or green or purple, they shouldn't be treated the way that Martin treated that lady. We talk about those things 'til the end of time, and I – b- before and after. That's n- that's – it's been the same sort of conversations. Now, I don't know why we didn't talk about the release on texts. I – I don't know if that's x- I don't know..."

DC Keyes, who already stated the illegal release of information is a significant event, stated the only conversation with AC Pridgen was about the arrest involving Officer Martin. As the Deputy Chief over Internal Affairs, he and the Assistant Chief over Internal Affairs, never discussed any possibilities about who could be responsible for the illegal release of information.

(576) Detective White—"The idea of somebody doin' that as a lone wolf is – I mean, it's pretty far out there. I mean, i- I- again, that's a very brazen move that most people would not pull off without sayin', "Hey, guess what I did?" But the other thing is – that we're lookin' at is why did everything stop on January 26th? I mean, e- I- well, b- that's what we can't figure out. I mean, ad nau- ad nauseum prior to January 26th, but on..."

(585) Detective White—"January 26th, not one single mention of, "Man, can you believe this stuff got released? Can – I – I'm wonderin' who did it." I mean, I'm thinkin' if – if I'm in this position, the first thing I'm – in my mind is, "Who the hell did it?""

(589) DC Keyes—"Jake, I'm not sayin' he didn't say that. I'm tellin' you I don't recall him sayin' that."

DC Keyes again can recall no specific conversations he had with AC Pridgen about the illegal release of information. However, he can recall numerous conversations he had with him about (ad nauseum) the arrest involving Officer Martin.

(743) DC Keyes—"I never initiated a conversation with him about Martin. Text or verbally or otherwise...

(748) DC Keyes: "...because I was sick and I'm – I'll tell you, I'm sick and tired of – and you don't – you can't get – I know you came up here Christmas day, too. I got a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. I know people don't really get that, but I was sick hearing Martin's name. Kinda irritating. When I heard it last week in training. Sh- no, this shit shouldn't have been released. Absolutely fuckin' wrong. It's not right. It is wrong. I didn't do it. It is a wrong thing to do, and I've told you, the person that did it should be fired in charge. I would tell you that, but I'm not gonna say that Pridgen did it when everybody say, "Hey, Pridgen and Vance did it." Maybe he did. He has to answer. He can tell you why he did this or why – you – you told me last time, irrefutable, it came from his computer, right?"

DC Keyes stated he never initiated a conversation with AC Pridgen about Officer Martin. However, phone records indicated DC Keyes initiated three (3) text message conversations with AC Pridgen about Officer Martin. Additionally, on January 18, 2017, the day the documents were downloaded in AC Pridgen's office, DC Keyes and AC Pridgen text back and forth 37 times. Some of the text messages are about Officer Martin.

(1185) Sergeant Mendoza: "You know, that day you brought your – you brought your personal phone."

(1187) DC Keyes: "Mm-hm."

(1189) DC Keyes: "That – that – that afternoon, you brought it in, (Jake) looked at it for five or ten minutes or whatever. But, again, we go- for us, we – you know, puttin' the facts together, e- what was a little concerning to me was just that the phone had been replaced on the 27th. Now, it could very much well be coincidental."

In the second and third interview, DC Keyes verbally stated he would allow his phone to be searched. He did not want Digital Forensics to download his phone, but he would allow Internal Affairs investigators to look at the contents. He also stated since he purchased a new personal phone in January he would bring in his old phone. DC Keyes never brought in his old phone. Since he purchased the phone in January, it would have had conversations with Merritt. Additionally, he said he used his personal phone to communicate with Merritt. However, he could not or would not show proof of his conversations with Merritt. Furthermore, when DC Keyes talks about his Apple iPhone he states he does not know what iCloud is and he is not familiar with iTunes.

(2696) DC Keyes: " I have no fear of takin' a polygraph. I think they're junk science, absolutely, but I'll take it. Do I think they're pseudoscience? Absolutely."

This is the same terminology used by AC Pridgen to describe a polygraph.

(2840) Detective White: "... what was his demeanor towards the release?"

(2844) DC Keyes: "I don't recall. I just remember him sayin' we shouldn't be in a situation. This isn't – this is an embarrassment. This is, like – all this is in a – and we both said we are, like, the national – a national laughing stock."

This is another example of how DC Keyes focused on the incident involving Officer Martin and not the illegal release of documents.

(2899) Detective White: "Who's happy about it bein' released?"

(2905) DC Keyes: "A lot of people in the community. They say, "Oh, you dirty cops.""

(2907) Detective White: "Well, in the department, in particular."

(2909) DC Keyes: "No. I was just takin' a guess. I as- I – I said I bet there will be officers that will be happy, and he said "Yes." Because, again, people see things as bein' disparately different. I see things as bein' disparately different. Sometimes along race."

(2958) DC Keyes: "... To me, that's what it is. And to me, it smacks of, "I don't trust you because you're black." Or "I don't trust you because this is black and this is a black family and a white officer." And that's what I get from it. And that's not me. And that's why I'm bothered by this whole entire – think it should be personally embarrassed. It bothers me professionally. It does.

DC Keyes consistently states he does not recall any conversations with AC Pridgen about the illegal release of documents. However, in this line of questioning he states he told AC Pridgen "I bet there will be officers that will be happy." AC Pridgen replied, "yes." Furthermore, the comments about race, along with much of the content in the text messages between Pridgen and Keyes revolve around race and perceived inequitable treatment of people based on race. The particularly long text exchange on the same day that the leaked documents were downloaded are of particular interest.

(3001) Detective White: "... he never said anything, from the 26th on."

(3005) DC Keyes: "... He never expressed any joy or glee or any satisfaction. We re- like, I don't remember talk- maybe we did, but I don't remember. It's not one of those things – I'm telling you, it's not one of those things I would remember..."

In this part of the interview "he" is AC Pridgen. This is another example of how DC Keyes cannot recall anything AC Pridgen said about the illegal release of documents. Unlike earlier in the conversation, DC Keyes can now not remember what AC Pridgen said. However, earlier in the conversation he said they talked about how the illegal release of documents made the FWPD a "laughing stock."

(458) AC Kraus: "How many city attorneys were connected that evening?"

3rd interview (line number)

(460) DC Keyes—"I don't know if I contacted Tish Brown or not. I think that I did, I have - you could get Tish's phone, go through my phone and see if it's in there. Um, I think I had tried to contact Tish.

There is no evidence DC Keyes tried to contact Laitin Brown. He remembered many details about Merritt, he remembered AC Pridgen asking him about Kim Cole, but he does not remember trying to contact a City Attorney.

(1175) Detective White—"...which phone did you use to call Lee Merritt?"

(1177) DC Keyes—"I would've used this phone."

(1179) Detective White—"Is that your work or personal?"

(1181) DC Keyes—"That's my personal phone."

(1183) Detective White—"Okay. Any reason why you would've used that over your city phone?"

(1185) DC Keyes—"The reason why I would've used this over my city phone is because I had his number in here, um, his is the number I used during the daytime for the most part. Uh, I use this phone but I got so many bogus jacked up telemarketers that if I'm not - if I'm on call I always give this number out 'cause this is my night time, this is my phone for night time if somebody calls me it's gonna be police at night and it's gonna be this I got marine buddy's in Hawaii and they'll just call not carin' what time it is, drunk or whatever and they'll wake me up this whole thing and so I try to keep 'em separate. Now if there's any city business to be done it's always on this phone. But a phone call I'll, yeah, like you have this number, you called this number yesterday from 392 number but I prefer we use this number but they don't always use this number. I've had this one for 16 years I've had this number for (unintelligible) Lieutenant so that's why people have this number, they call this number (unintelligible) issued a city phone."

DC Keyes showed no supporting information in his personal phone of him contacting Merritt. He stated in an earlier interview he would bring in his old personal phone for examination, but he did not, so there was no analysis of his calls and/or text messages with Merritt.

(3078) AC Kraus—"is nickname preposterous was that a one-time use?

(3080) DC Keyes—"One time, yeah, that was one-time use..."

(3106) AC Kraus—"where did the - the nickname for Art come up?"

(3108) DC Keyes—"After (unintelligible) I call him that because he's clueless."

(3110) AC Kraus—"... abstract."

(3112) DC Keyes—"Because he's clueless."

(3125) AC Kraus—"So, DC, (Dumpy) DC Husky and Oompa Loompa, they're not me?"

(3127) DC Keyes—"No, that's" Ty.

(3129) AC Kraus—"All of 'em?"

(3131) DC Keyes—"And Tele-tubby too. Yeah"

(3167) AC Kraus—"What's the origin of Captain (Fitts) nickname?"

(3169) DC Keyes—"Oh my God. All right, so (unintelligible) we'll say do somethin' and then he like - we have to tell him again because he always questions stuff. Not (unintelligible) so it's a remake so I can do over it's like you gotta do it again so we'll say, "Can you (unintelligible)," so that's what it is."

(3174) AC Kraus—"Okay. What about Kemper's nickname?"

(3176) DC Keyes—"I don't know her nickname, it's Gretel, that was it. That's the only nickname unless you found something different. Hansel and Gretel. You know something different?"

DC Keyes uses nicknames for multiple command staff members.

Friday, March 31, 2017

Witness-Sergeant Tom Busker

Interview

Detective White met with Sergeant Busker at the Internal Affairs office and conducted a recorded interview (EXHIBIT 91). Prior to the interview, Sergeant Busker read and signed an Administrative Warning Statement (EXHIBIT 92). The recorded interview is summarized below.

On or about Monday, January 30, 2017, Sergeant Busker and Lieutenant Criado were in AC Pridgen's office speaking about the "Drug Market Intervention program." While they were in AC Pridgen's office, Lieutenant Criado brought up the illegal release of Officer Martin's "G-File" information. Lieutenant Criado stated to AC Pridgen because the documents were protected and there was only a small number of personnel who had access to the protected documents, it should be "easy" to figure out who released or copied the information. After making this statement, Sergeant Busker observed AC Pridgen push away from his desk, spread and raise his arms, and state, "You can't look at who has access to the information today. You have to look at everyone who had access to the information in the past..." Lieutenant Criado pointed out that even the older information was restricted, so the list of people who had access was still small. AC Pridgen mentioned personnel at the District Attorney's office had copies of the Axon video and City Legal also had access to other documents.

Sergeant Busker has been employed by the Department for 27 years. 12 of his 27 years, Sergeant Busker was a detective in Robbery and Major Case. Sergeant Busker has been



extensively trained in interview and interrogation. Sergeant Busker has interviewed many suspects in criminal offenses and is familiar with behavior consistent with deception.

Based on AC Pridgen's position in the Department and the topic being discussed, Sergeant Busker was surprised by AC Pridgen's reaction. AC Pridgen did not focus on who released the information or how it was released. AC Pridgen's reaction seemed inappropriate due to his position in the Department.

Monday, April 3, 2017

Witness-Lieutenant Marci Conrad #2810

Interview

Detective White conducted a recorded phone interview (EXHIBIT 93) with Lieutenant Conrad. The recorded interview is summarized below.

Lieutenant Conrad stated she has no knowledge of DC Keyes having any involvement with the illegal release of protected documents. Furthermore, she never told DC Keyes she heard he was present when documents were downloaded or released. She has heard rumors about the investigation from many people on the Department, but all she has heard is rumors.

Tuesday, April 4, 2017

Terry Daffron Telephone Interview

On Tuesday, April 4, 2017, Detective Lamond conducted a telephone interview with Attorney Terry Daffron (EXHIBIT 94). Ms. Daffron is the attorney of record for Officer William Martin on the original disciplinary suspension which gave rise to the present investigation into leaked material.

Ms. Daffron received a flash drive from City Attorney Elizabeth Dierdorf on Thursday, January 26, 2017, at approximately 6:00 p.m. Ms. Daffron received the flash drive at Fort Worth City Hall. The flash drive contained information necessary for Ms. Daffron to prepare an appeal for Officer Martin in relation to his disciplinary suspension. The flash drive contained information about 2016 disciplinary case regarding the Craig family, the SIU case, as well as other material which is considered to be part of Officer Martin's protected personnel record.

Ms. Daffron said she did not leak the material, and believes she received the flash drive between twelve and eighteen hours after the material was leaked by Lee Merritt. Ms. Daffron argued that the information which was released was harmful not only to Officer Martin's career, but his personal safety as well as that of his family.

Wednesday, April 12, 2017

Detective Jacob White

On Wednesday, April 12, 2017, Assistant Chief Ed Kraus interviewed Detective Jacob White in the Internal Affairs interview room. The conversation centered around the arrest of Jacqueline Craig, and Detective White's decision to respond to the jail.

On December 21, 2016, at approximately 11:00 p.m., Sergeant Mendoza contacted Detective White about a possible excessive force investigation and a video which had gone viral, and directed Detective White to respond to the jail. This was the first time Detective White had ever been directed to go to the jail, and Detective White found it to be very unusual, stating in the three years he has worked in Internal Affairs, this is the first time Internal Affairs had responded to the jail for an allegation of misconduct. Detective White first went to the Internal Affairs office to gather necessary forms, and before leaving the office he watched Officer Martin's body-worn camera footage from the scene. Detective White and Sergeant Mendoza then took separate cars to the jail.

Upon arriving at the jail, Detective White and Sergeant Mendoza entered together and walked toward the Jail Sergeant's office. There Detective White observed a black male with a beard, who was later identified as Lee Merritt. Mr. Merritt was standing by himself in a hallway, inside the jail.



secured jail to which the public does not have access. Detective White did not know who Mr. Merritt was until Deputy Chief Keyes identified him as the attorney for the Craig family, which shocked Detective White. In 17 years with the police department, Detective White has never seen an attorney inside the jail. Detective White recalled a TCU investigation approximately five years ago where a student's attorney tried to gain entry into the jail in an attempt to secure the release of his client, and that attorney was not allowed inside. Deputy Chief Keyes told Detective White that he made the decision to allow Lee Merritt inside the jail.

Detective White, Sergeant Mendoza, and Lieutenant Noakes decided to interview the two females who had been arrested, and Deputy Chief Keyes indicated the attorney [Lee Merritt] wanted to be present for the interviews. Detective White had never previously conducted an Internal Affairs interview at the jail, and had never conducted an Internal Affairs interview with the complaining person's attorney present. Detective White said doing so is not a regular practice.

Determining a location to conduct interviews presented unique problems. There was a need to find a recorded interview room for which other detectives did not have access to the video system. It was decided to use a room on the second floor of 350 W. Belknap. Before the Craig family members could be interviewed, they had to be checked out from the jail. Upon relocating out of the jail, Lee Merritt was allowed to speak to the Craig family members prior to being interviewed by Internal Affairs. Afterwards, Jacqueline Craig was interviewed then Brea Hymond. Each was interviewed by Detective White and Sergeant Mendoza, with Lee Merritt present. While one was interviewed, the other sat in the lobby with Lieutenant Noakes and Deputy Chief Keyes. The interviews lasted approximately 15 minutes. At one point during Jacqueline Craig's interview, Lee Merritt interjected by telling her that if she did not remember, to state you do not remember. Lee Merritt was not told not to interject, because he had shown Detective White a document stating his firm was representing the Craig family.

After the interviews, Detective White, Deputy Chief Keyes and Lieutenant Noakes moved to another office to speak. While there, Deputy Chief Keyes spoke several times to Assistant Chief Pridgen, including a time when the call was put on speaker for Detective White to hear. Deputy Chief Keyes became adamant that Jacqueline Craig and Brea Hymond should be released from custody. Detective White was in complete belief because a magistrate had agreed to the jail affidavit that probable cause existed for the arrest, and because he thought the arrests were proper after seeing the body-worn camera footage. Detective White believed that Deputy Chief Keyes and Assistant Chief Pridgen had not seen Officer Martin's body-worn camera footage at that time, and does not believe they had spoken with any other officers or supervisors that were on the scene of the arrests.

Detective White was not aware of any prior incidents where a supervisor tried to release a prisoner that had been arrested by an officer, and said neither of the Craig family members was injured during the arrest. No deadly force was used, and the Taser was displayed but not deployed. Detective White said he consulted the Penal Code and found the elements of the offense were present. He

Page 82 of 93

told those around him the jail release couldn't happen, and noted Mrs. Craig had warrants. Detective White remembered hearing Assistant Chief Pridgen say over the phone something to the effect, "they're just traffic warrants." Deputy Chief Keyes said they could call PIC and "un-confirm" the warrants.

Detective White was directed to go meet with the magistrate. He, Sergeant Mendoza, and Lieutenant Noakes relocated to the Judge Gonzalez' office in the basement. Sergeant Mendoza spoke to Judge Gonzalez about releasing the Craig family, who called and spoke to the Chief Magistrate. Judge Gonzalez informed Internal Affairs personnel that the only way he could release the Craig family was if they would sign a form indicating the facts on the jail affidavit were false. Detective White was not willing to sign such an affidavit because of what he had seen on video and the jail paperwork. Judge Gonzalez was not the magistrate who originally considered Officer Martin's jail affidavit.

Internal Affairs personnel returned to the location on the second floor where Deputy Chief Keyes, Lee Merritt, and the Craig family was still located. Deputy Chief Keyes was informed that the Craig family would not be released from jail at that time, and the Craig's were returned to the jail facility in the basement.

Detective White said it was strange that Deputy Chief Keyes and Assistant Chief Pridgen wanted to release the Craig family from custody. He said the investigation was by no means thorough or complete. He remembered telling Sergeant Mendoza and Lieutenant Noakes there was no way the judge would release the Craig family. He remembered asking Lee Merritt for a business card, and Lee Merritt didn't have one. He did not think Lee Merritt's actions, and those of his partner, were consistent with attorneys when representing their clients. Detective White learned later that Lee Merritt was not licensed to practice law in Texas.

On a later interview with another witness, Internal Affairs personnel had to allow Lee Merritt's partner Jasmine Crockett to be present because of what happened with Lee Merritt at the jail the night of the arrest.

Detective White felt that because of Lee Merritt's involvement in the night of the arrest, it appeared as if the department had already decided that something wrong had occurred. "We were jumping through hoops we've never jumped through before." Because of the involvement of the attorneys, there is a chance that the interviews with the Craig and the other witnesses did not reveal everything that occurred.

**Sergeant Richard Mendoza**

On Wednesday, April 12, 2017, Assistant Chief Ed Kraus interviewed Sergeant Richard Mendoza in the Internal Affairs interview room.

Page 83 of 93

Sergeant Mendoza was notified about 9:30 p.m. by Sergeant Mike Williams, who sent a link to the Facebook video. Sergeant Mendoza then called and notified Lieutenant Noakes, who did not know about the matter yet. By the time Sergeant Mendoza saw the video, it already had several hundred thousand views, and due to the viral nature, thought it might be important to respond after-hours to see if an Internal Affairs investigation was necessary. Sergeant Mendoza believed Lieutenant Noakes was getting calls from people above him in the department as well, and thinks Lieutenant Noakes ultimately made the decision to respond to the jail. Sergeant Mendoza learned that Deputy Chief Keyes was going to the jail as well, but could not recall whether he spoke directly with Deputy Chief Keyes or he heard that from Lieutenant Noakes. Sergeant Mendoza responded by first going to the Internal Affairs office and met briefly with Detective White, then relocated to the jail.

Upon arriving at the jail, Deputy Chief Keyes was already there and inside the facility. Sergeant Mendoza thinks Lieutenant Noakes arrived shortly before himself and Detective White. Another gentleman was present as well, dressed in a suit, who was later identified as Lee Merritt. When he learned Lee Merritt was present as an attorney for the Craig family he thought it was highly out of the norm. In 18 years in law enforcement, Sergeant Mendoza could not remember ever seeing an attorney inside that secure area. The area is for arrested persons and law enforcement personnel. Lieutenant Noakes informed Sergeant Mendoza that Deputy Chief Keyes had admitted Lee Merritt into the jail, which shocked Lieutenant Noakes as well. As a mid-level supervisor, Sergeant Mendoza would not approach Deputy Chief Keyes to question what was happening because it was not his role. No explanation was given as to why Lee Merritt was admitted into the jail.

The arrest paperwork for Jacqueline Craig and Brea Hymond was reviewed, and Sergeant Mendoza and Detective White decided to conduct interviews with them. The location for the interviews had to be selected, and the vacant offices on the second floor was chosen. Sergeant Mendoza learned that Lee Merritt was going to be present for the interviews, which put Internal Affairs personnel "between a rock and a hard place." This was out of the norm and Sergeant Mendoza could not recall any other time that an attorney had been present in an Internal Affairs interview.

Sergeant Mendoza and Detective White interviewed Jacqueline Craig first in the executive conference room, and Lee Merritt was present. Deputy Chief Keyes and Lieutenant Noakes sat outside in the lobby with Brea Hymond. Lee Merritt sat back and was mostly quiet, only speaking up once on an unimportant note.

After Brea Hymond was also interviewed, Deputy Chief Keyes, Lieutenant Noakes and Detective White went into the former chief's office to discuss releasing Brea Hymond and Jacqueline Craig from custody. Prior to that discussion, it was evident to Sergeant Mendoza that Deputy Chief Keyes and Assistant Chief Pridgen wanted to get them [Craig and Hymond] out of jail that night. Deputy Chief Keyes was on the phone a lot during this event. After the discussion in the Chief's office, it was decided that Lieutenant Noakes, Sergeant Mendoza, and Detective White were going downstairs to speak with the magistrate about the release of Craig and Hymond. That was not

standard practice and Sergeant Mendoza did not agree with it. Releasing them that night and making the case a suspect case was mentioned, but because Craig's warrants had been confirmed that did not seem a viable option. Upon making contact with magistrate Simon Gonzalez, Sergeant Mendoza explained they were inquiring as to the release of Craig and Hymond. Judge Gonzalez made a phone call then informed Internal Affairs personnel that in order to release Craig and Hymond, an affidavit would have to be signed stating the details in the original arrest affidavit were false. Sergeant Mendoza's immediately responded that would not happen. The conversation about releasing Craig and Hymond would never have occurred but for the involvement of Deputy Chief Keyes and Assistant Chief Pridgen. When he viewed the video, Sergeant Mendoza saw some behavior he thought was a problem and though Officer Martin did not handle the call well, but did not think there was anything wrong with the arrest affidavit. Sergeant Mendoza does not believe that Deputy Chief Keyes or Assistant Chief Pridgen had the opportunity to read the report, or to speak with any witness prior to their involvement that night. None of the other officers from the arrest scene had been spoken to as of that time.

After the decision was made that Craig and Hymond would not be released from the jail, the Internal Affairs personnel went back to the second floor where Craig, Hymond, Lee Merritt and Deputy Chief Keyes were still located. It was announced that they would not be released from jail, and little was said about this. No further action was taken on the case that night after Craig and Hymond were returned to the jail.

Sergeant Mendoza remembered the attorney [Merritt] advised he was going to be in the interviews with Craig and Hymond. Merritt said this while inside a secured area of the jail, and if it were up to Sergeant Mendoza, Merritt would never have been allowed into the facility. If Deputy Chief Keyes had not been present but rather spoken on the phone with Sergeant Mendoza, Sergeant Mendoza would have stood up for what's right and said "we don't let civilians into this area." If Deputy Chief Keyes had not been present, there would have been no discussion about releasing Craig and Hymond from jail. Since Lee Merritt was present in the Craig and Hymond interviews, it was necessary to have Jasmine Crockett present when another witness, a family member of Jacqueline Craig, was interviewed. When follow-up attempts were made to contact the other persons who were present in the video, those persons told Internal Affairs personnel they would not speak to them and to talk to Lee Merritt. When requests were made to interview other persons who were present, Lee Merritt always demanded that in exchange for an interview, the criminal charges need to be dropped. Sergeant Mendoza felt that allowing Lee Merritt to be in the jail and involved in the early interviews gave Merritt the impression that he "could call the shots."

**Lieutenant Neil Noakes**

On Wednesday, April 12, 2017, Assistant Chief Kraus interviewed Lieutenant Neil Noakes by telephone.

The night of December 21, 2016, Lieutenant Noakes was contacted by Deputy Chief Keyes who told him there was a video that had gone viral on social media which looked bad for our department. Deputy Chief Keyes sent Lieutenant Noakes a link to the video, which Lieutenant Noakes watched, where Officer Martin had arrested Jacqueline Craig and her daughters. Lieutenant Noakes called Detective White, who ordered Internal Affairs personnel to report to the jail. Lieutenant Noakes arrived at the jail, followed by Deputy Chief Keyes, and later Sergeant Mendoza and Detective White. Deputy Chief Keyes came into the jail with an attorney he later learned was Lee Merritt. Lieutenant Noakes initially assumed Merritt was a city attorney, and thought it was odd for a city attorney to meet them at the jail, but perhaps due to the viral video was there to consult with them about the matter. Upon learning Lee Merritt was a civil rights attorney, Lieutenant Noakes was shocked and did not think it was appropriate for him to be inside the jail. Lieutenant Noakes mentioned to Deputy Chief Keyes, Sergeant Mendoza, Detective White, and Jail Sergeant Denum that he didn't think it was appropriate. Deputy Chief Keyes responded something to the effect of, "he's already here, we'll just keep him out of the way." Lieutenant Noakes doesn't remember there being a discussion as to allowing Lee Merritt to be present in the interviews with Craig and Hymond, and was not sure whose decision that was. Lieutenant Noakes does not know if Deputy Chief Keyes consulted with anyone else about allowing Lee Merritt to be in the interviews.

Deputy Chief Keyes and Assistant Chief Pridgen made several calls about the direction for the case, and Internal Affairs personnel were directed to do whatever they could to get Craig and Hymond released from jail that night. The discussion about releasing them occurred both prior to and after the interviews with Craig and Hymond. Deputy Chief Keyes was inclined to release them, but Lieutenant Noakes was not comfortable with it. Deputy Chief Keyes did not share with Lieutenant Noakes any additional information which would support releasing them from jail. Lieutenant Noakes has worked in Internal Affairs over a year. It is unusual to interview people at the jail about a complaint, and he's never heard of it being done. He has never heard of a person's attorney being present when a citizen is making an administrative complaint against an officer and Internal Affairs does not allow it.

Craig and Hymond were relocated to the second floor for interviews but Lieutenant Noakes did not participate in the interviews. After the interviews were conducted, Deputy Chief Keyes spoke by telephone with Assistant Chief Pridgen on speaker about releasing Craig and Hymond, as well as the juvenile who was arrested. Lieutenant Noakes, Sergeant Mendoza, and Detective White went downstairs to speak with Judge Gonzalez about the matter. The magistrate was not going to release them from jail unless Lieutenant Noakes would sign a document stating the arresting officer either lied or was wrong in the arrest affidavit. Lieutenant Noakes refused to do so because there was insufficient information to draw either of those conclusions.

The Internal Affairs personnel went back upstairs where Craig, Hymond, Deputy Chief Keyes, and Lee Merritt were waiting. Deputy Chief Keyes and Assistant Chief Pridgen explained the matter. Assistant Chief Pridgen was

disappointed because he had been outraged by the video. Lieutenant Noakes said he did not have enough information to say that Officer Martin's affidavit was wrong or that Officer Martin had lied. Although Deputy Chief Keyes had directed Lieutenant Noakes, Sergeant Mendoza, and Detective White to speak to the magistrate about the release of Craig and Hymond, Lieutenant Noakes believes that directive came from Assistant Chief Pridgen.

In Lieutenant Noakes' opinion, allowing Lee Merritt into the jail and the interviews may have influenced the investigation later. It was not in keeping with standard practice. The following day, Deputy Chief Keyes informed Lieutenant Noakes that Lee Merritt had surreptitiously recorded him while inside police facilities. Lieutenant Noakes believed that recording may have been seen on social media and mentioned to Deputy Chief Keyes.

Lieutenant Noakes believes it was very clear Lee Merritt's loyalties were to his client and not the department. Based on that, it was not a wise decision to break protocol and allow him inside the jail. Lieutenant Noakes believes that as a prior lieutenant in Internal Affairs, and serving over Internal Affairs, Deputy Chief Keyes was very aware of protocol regarding Internal Affairs operations.

## INVESTIGATOR NOTES

- February 23, 2017, Detective White emailed Shaun King asking him to call.
- March 1, 2017, Detective White called Lee Merritt. Detective White was unable to leave a message because Mr. Merritt's voicemail was full.
- March 6, 2017, Merritt did not show for his 1000 am interview
- On Thursday, January 26, 2017, Chief Fitzgerald offered and relinquished his laptop computer to Captain Pitt for examination in the case. Upon conferring with the Digital Forensics Unit, Captain Pitt determined that imaging the laptop was not appropriate in this case because Chief Fitzgerald did not use the laptop to access Blue Team information.

## EXHIBITS

EXHIBIT 1-Video of article on theroot.com

EXHIBIT 2-Merritt and Crockett Facebook video

EXHIBIT 3-Fort Worth Star-Telegram article

EXHIBIT 4-Chief Fitzgerald email

EXHIBIT 5-AC Pridgen email to Captain Pitt about three USB devices

EXHIBIT 6-Lieutenant Gutter email to Captain Pitt

EXHIBIT 7-

EXHIBIT 8-

EXHIBIT 9-

EXHIBIT 10-

EXHIBIT 11-

EXHIBIT 12-

EXHIBIT 13-Lieutenant Fimbres interview

EXHIBIT 14-Lieutenant Fimbres Admin Warning

EXHIBIT 15-ACM Valerie Washington email to Lieutenant Fimbres about press release

EXHIBIT 16-Lee Merritt Facebook page "injusticeinhd"

EXHIBIT 17-Dropbox account zip file from Lee Merritt's Facebook page

EXHIBIT 18-Elizabeth Dietdorf interview

EXHIBIT 19-Digital Forensic Lab summary

EXHIBIT 20-Digital Forensic Lab timeline

EXHIBIT 21-DC Keyes signed PC

EXHIBIT 22-DC Keyes 1st Admin Warning

EXHIBIT 23-DC Keyes 1st recorded interview
EXHIBIT 24-AC Pridgen requesting Blue Team case from Felicia Grantham
EXHIBIT 25-AC Pridgen mailed Personnel Complaint
EXHIBIT 26-AC Pridgen mailed Detached Duty Paperwork
EXHIBIT 27-Dallas Morning News article
EXHIBIT 28-AC Pridgen signed Personnel Complaint
EXHIBIT 29-AC Pridgen signed Detached Duty Paperwork
EXHIBIT 30-DC Keyes Detached Duty paperwork
EXHIBIT 31-DC Keyes 2nd signed Admin Warning
EXHIBIT 32-DC Keyes 2nd recorded interview
EXHIBIT 33-AC Pridgen 1st signed Admin Warning
EXHIBIT 34-AC Pridgen 1st recorded interview
EXHIBIT 35-AC Pridgen's draft press release
EXHIBIT 36-Nicole Garcia's 1st recorded interview
EXHIBIT 37-Nicole Garcia's 2nd recorded interview
EXHIBIT 38-Nicole Garcia's signed Admin Warning
EXHIBIT 39-AC Pridgen and Nicole Garcia text messages
EXHIBIT 40-Detective Banda recorded interview
EXHIBIT 41-Detective Banda signed Admin Warning
EXHIBIT 42-Scott Gordon's open records request
EXHIBIT 43-Sergeant Wheeler recorded interview
EXHIBIT 44-Sergeant Wheeler signed Admin Warning
EXHIBIT 45-Sergeant Hudson recorded interview
EXHIBIT 46-Sergeant Hudson signed Admin Warning

EXHIBIT 47-Officer Hodge recorded interview
EXHIBIT 48-Officer Hodge signed Admin Warning



EXHIBIT 53-Sergeant Williams recorded interview
EXHIBIT 54-Sergeant Williams signed Admin Warning
EXHIBIT 55-FWBLEOA statement
EXHIBIT 56-Lieutenant Gutter recorded interview
EXHIBIT 57-Lieutenant Gutter signed Admin Warning
EXHIBIT 58-Tom Sullivan recorded interview
EXHIBIT 59-Tom Sullivan signed Admin Warning
EXHIBIT 60-Email to AC Pridgen about open records request
EXHIBIT 61-DC Keyes 3rd recorded interview
EXHIBIT 62-DC Keyes 3rd signed Admin Warning
EXHIBIT 63-DC Keyes email to ACM Washington
EXHIBIT 64-AC Pridgen 2nd recorded interview
EXHIBIT 65-AC Pridgen 2nd signed Admin Warning
EXHIBIT 66-AC Pridgen timesheet from January 20, 2017
EXHIBIT 67-DC Keyes 1st interview transcripts
EXHIBIT 68-DC Keyes 2nd interview transcripts
EXHIBIT 69-DC Keyes 3rd interview transcripts
EXHIBIT 70-DC Keyes 1st interview transcript affidavit

EXHIBIT 71-DC Keyes 2nd interview transcript affidavit

EXHIBIT 72-DC Keyes 3rd interview transcript affidavit

EXHIBIT 73-AC Pridgen 1st interview transcripts

EXHIBIT 74-AC Pridgen 2nd interview transcript

EXHIBIT 75-AC Pridgen 1st interview transcript affidavit

EXHIBIT 76-AC Pridgen 2nd interview transcript affidavit

EXHIBIT 77-DC Keyes internal Affairs history

EXHIBIT 78-DC Keyes commendations

EXHIBIT 79-AC Pridgen Internal Affairs history

EXHIBIT 80-AC Pridgen commendations

EXHIBIT 81-Sergeant Van Houten recorded interview

EXHIBIT 82-Sergeant Van Houten signed Admin Warning

EXHIBIT 83-AC Pridgen DFL phone analysis for open records request

EXHIBIT 84-Dominque Alexander recorded interview

EXHIBIT 85-Captain Pitt IOC

EXHIBIT 86-DC Ramirez recorded interview

EXHIBIT 87-DC Ramirez signed Admin Warning

EXHIBIT 88-Officer Martin recorded interview

EXHIBIT 89-Officer Martin signed Admin Warning

EXHIBIT 90-AC Pridgen Internal Affairs class

EXHIBIT 91-Sergeant Busker recorded interview

EXHIBIT 92-Sergeant Busker signed Admin Warning

EXHIBIT 93-Lieutenant Conrad recorded interview

E EXHIBIT 94-Terry Daffron recorded interview

Page 92 of 93